The **GLOBE SAVINGS BANK, F.S.B.**
and **Phoenix Capital Group, Inc.,**
Plaintiffs,

v.

The **UNITED STATES,** Defendant.

No. 91–1550C.

United States Court of Federal Claims.

Feb. 11, 2003.

projected from those losses. The court need not          resolve this issue.

Melvin C. Garbow, Washington, DC, for the plaintiffs. Howard N. Cayne and Walter F. Zenner, of counsel.

Luke Levasseur, Washington, DC, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for the defendant. Tonia Tornatore, Department of Justice, of counsel.

## OPINION

YOCK, Senior Judge.

On October 29, 1991, the Globe Savings Bank, F.S.B. ("Globe") and the Phoenix Capital Group, Inc. ("Phoenix") (collectively, the "Plaintiffs") filed a Complaint in this Court against the United States (the "Defendant" or the "Government") alleging breach of contract, uncompensated Fifth Amendment takings, denial of due process, and unjust enrichment. On April 30, 2001, this Court ordered the dismissal of all claims except the breach of contract claim upon the Plaintiffs' motion to amend. This matter is now before the Court on the Plaintiffs' "Short–Form" Motion for Partial Summary Judgment on Liability and the Defendant's Cross–Motion for Summary Judgment, as updated and supplemented by the parties by Order of this Court. For the reasons set forth herein, the Plaintiffs' "Short–Form" Motion for Partial Summary Judgment on Liability is GRANTED, and the Defendant's Cross–Motion for Summary Judgment (on liability) is DENIED.

### Background

A. The Savings and Loan Crisis

This case is one of the numerous *Winstar*-related cases currently pending before this Court. The *Winstar* cases arose in the aftermath of the Government's efforts to contain the savings and loan crisis of the late 1970's and the early 1980's. The details of this financial crisis were fully articulated in *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*").

As the Supreme Court observed in *Winstar III,* the thrift industry is one of the most highly regulated businesses. 518 U.S. at 844, 116 S.Ct. 2432 (citing *Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947)). The Federal Government has worked hard over the years both to protect thrift depositors and to allow home loan borrowers access to mortgage loans at affordable rates. The modern regulatory regime for the thrift industry originated during the Great Depression of the 1930's, when Congress created two federal entities to supervise thrifts: the Federal Home Loan Bank Board (the "FHLBB" or the "Bank Board"), which primarily was responsible for thrift regulation, and the Federal Savings and Loan Insurance Corporation (the "FSLIC" or the "Corporation"), which insured thrift deposits. *Id.* See Federal Home Loan Bank Act, ch. 522, 47 Stat. 725 (1932) (codified, as amended, at 12 U.S.C. §§ 1421–1449 (1988 ed.)); Home Owners' Loan Act, ch. 64, 48 Stat. 128 (1933) (codified, as amended, at 12 U.S.C. §§ 1461–1468 (1988 ed.)); National Housing Act, ch. 847, 48 Stat. 1246 (1934) (codified, as amended, at 12 U.S.C. §§ 1701–1750g (1988 ed.)).

During the late 1970's and the early 1980's, however, the thrift industry faced a new financial crisis that severely taxed the resources of the Depression-era regulatory regime. Short-term interest rates paid to depositors by savings and loan associations rose to a level that exceeded the fixed, long-term interest rates received by such institutions from home mortgage loans, creating a significant threat to the solvency of many thrifts. *See Winstar III,* 518 U.S. at 845, 116 S.Ct. 2432. Between 1981 and 1983, approximately 435 savings and loan institutions failed. *Id.* These failures threatened to drain the insurance funds set aside by the FSLIC to protect investors' deposits. *Id.* at 846–47, 116 S.Ct. 2432. The crisis was further exacerbated by initial efforts to resolve the thrifts' difficulties through deregulation. In many instances, allowing the thrifts greater flexibility in investing and lowering their required reserves merely led to increased bad

loans and weaker thrifts. *Id.* at 845–46, 116 S.Ct. 2432.

In an effort to save failing thrifts while limiting the costs to the FSLIC insurance fund, the FHLBB and the FSLIC began to encourage healthy thrifts and outside investors to take over weak thrifts through "supervisory mergers." Because the prospect of acquiring a failing savings and loan, whose liabilities outweighed its assets, generally was not an attractive proposition to a reasonable investor or thrift, the Bank Board and the Corporation offered various incentives to those willing to take over failing thrifts. These incentives included direct cash subsidies and/or promissory notes from the FSLIC, as well as significant noncash incentives such as a "capital credit" and the special treatment of "supervisory goodwill."[1] The "capital credits" incentive effectively allowed an acquiring institution or investor to double count a direct cash subsidy from the FSLIC on its balance sheets as both a credit for a tangible asset and a permanent credit to regulatory capital. This was done by not requiring the acquired thrift to subtract the cash received from the FSLIC from the goodwill created by the acquisition. The special treatment of "supervisory goodwill" similarly allowed a thrift to inflate regulatory capital, in this instance by treating the goodwill recognized as a result of the acquisition as regulatory capital. Without such a forbearance, the Bank Board would have treated goodwill as an intangible asset, which would not have been added to a bank's regulatory capital. By increasing the thrift's regulatory capital through such noncash incentives, the thrift was permitted to keep less cash on hand and make more loans, thereby increasing potential profitability. These noncash incentives were so intrinsic to the Government's efforts to contain the savings and loan crisis that the Bank Board issued publications describing and specifically authorizing the use of the capital credit and supervisory goodwill forbearances. *See* FHLBB Memorandum SP–37a (Mar. 7, 1986). *See also Coast Fed. Bank, F.S.B. v. United States,* 48 Fed.Cl. 402, 409 n. 6 (2000).

## B. Phoenix's Acquisition of Globe

OK Federal Savings and Loan Association ("OK Federal") was an FSLIC-insured mutual savings and loan association located in El Reno, Oklahoma. During the early 1980's, OK Federal experienced significant financial losses as a result of the interest rate crunch and its high risk lending practices. By May 1984, the thrift was insolvent. The FSLIC estimated that, as of May 31, 1987, OK Federal had a net worth deficit of $38.31 million.

OK Federal entered into a Consent Agreement with the FHLBB on April 18, 1985. The Consent Agreement allowed the Bank Board to seek an acquirer or merger partner for OK Federal, to request the resignation of officers or directors, and to restrict severely the transactions that the thrift could conduct without prior approval. The case was transferred to the FSLIC for resolution on May 1, 1985. The Corporation sought an outside investor to acquire and manage OK Federal, but initially received no acceptable proposals. Finally, on July 31, 1986, the FHLBB received an "unsolicited" proposal[2] for the acquisition of OK Federal from Phoenix, a Nevada holding company. Phoenix was created expressly for the purpose of acquiring all of the common stock of OK Federal upon its

---

1. The FSLIC also purportedly offered guarantees against capital losses on the sale of acquired assets ("capital loss coverage"), guarantees against interest losses on nonperforming assets ("yield maintenance"), and indemnification against certain claims as additional incentives to promote supervisory acquisitions. *See Bluebonnet Sav. Bank, F.S.B. v. United States,* 47 Fed.Cl. 156, 160 (2000), *rev'd and remanded on other grounds,* 266 F.3d 1348 (Fed.Cir.2001); *Statesman Sav. Holding Corp. v. United States,* 41 Fed. Cl. 1, 5 n. 4 (1998).

2. While the Plaintiffs admit that the FSLIC had no formal solicitations for OK Federal outstanding, they nevertheless assert that Phoenix's proposal was "informally solicited" by federal thrift regulators. According to the Plaintiffs, in May 1986, the Corporation informally invited Mr. Gerald O'Shaughnessy (a Wichita, Kansas investor who helped found and fund Phoenix) to submit a proposal to acquire OK Federal. The extent to which Phoenix's proposal was solicited or unsolicited, however, creates no issues of material fact for the purposes of the pending motions, and this Court declines to rule at this time as to the extent to which the Phoenix bid was sought by the FSLIC.

conversion from a mutual savings and loan association to a stock association.[3]

In the initial proposal dated July 31, 1986, Phoenix offered to contribute $3 million cash in exchange for all of the newly issued stock of the association.[4] Phoenix requested a cash contribution from the FSLIC to fully offset OK Federal's net worth deficit, as well as capital loss coverage, yield maintenance, and certain other indemnifications. Phoenix also explicitly sought several regulatory forbearances. In particular, Phoenix requested a "capital credit" forbearance in an amount equal to the requested FSLIC cash contribution. The proposal stated, in pertinent part,

> *FSLIC Assistance Credited to Net Worth.* The cash contribution to be made to OK Federal pursuant to an assistance agreement to be entered into between the FSLIC and OK Federal is to be a credit to OK Federal's net worth; therefore, for regulatory accounting purposes, OK Federal may book such contribution as a direct addition to its net worth.

Appendix to Plaintiffs' "Short–Form" Motion for Partial Summary Judgment on Liability ("Pls.' 'Short–Form' Motion App."), Ex. 4 at App. 46 (Phoenix Acquisition Proposal for OK Federal ("Acquisition Proposal") at 14 (July 31, 1986)). Phoenix also sought to have supervisory goodwill treated as an asset for regulatory purposes through the use of "push-down" accounting:

> *Push–Down Accounting.* For the purposes of reporting to the FHLBB, with respect to the books and records of OK Federal, push-down accounting shall be used to record the purchase of OK Federal's capital stock.

*Id.* at App. 45 (Acquisition Proposal at 13). *See also Winstar III,* 518 U.S. at 848–49, 116 S.Ct. 2432. The goodwill was to be amortized over a 25–year period (maximum) by the straight-line method:

> *Amortization of Intangible Assets.* For purposes of reporting to the FHLBB, the value of any intangible asset resulting from the application of pushdown accounting in accounting for the purchase may be amortized by OK Federal over a period not to exceed (25) years by the straight line method.

Pls.' "Short–Form" Motion App., Ex. 4 at App. 46 (Acquisition Proposal at 13).

After Phoenix's initial acquisition proposal was received, Phoenix and the FSLIC entered into a year-long negotiation that resulted in several revisions to the proposal and to Phoenix's business plan for Globe. Throughout these negotiations, the capital credit and the use of supervisory goodwill remained an integral part of the acquisition strategy for Globe. In an October 17, 1986 letter to the Bank Board, Phoenix listed the capital credit and goodwill forbearances as "essential terms" of the proposed acquisition. Pls.' "Short–Form" Motion App., Ex. 5 at App. 58–59 (Letter from P. Barnett to W. King, FHLBB 3–4 (Oct. 17, 1986)). The business plan submitted by Phoenix on October 24, 1986, as required by the Bank Board and the Corporation, made clear that Phoenix's short-term strategy for reviving OK Federal/Globe involved leveraging the proposed capital credit and supervisory goodwill to increase the thrift's useful assets.[5] *See id.,* Ex. 6 at App. 78, 81–82, 91–92 (Phoenix Capital Group, *Business Plan for Globe Savings Bank, F.S.B.* at 14, 17–18, 27–28 (Oct. 24, 1986)). When regulators at the Bank Board expressed skepticism about the projected asset growth rate suggested in Phoenix's initial business plan, the plan was revised on March 10, 1987 and again on May 28, 1987. *See id.,* Ex. 7 at App. 211, 215–16, 229–30 (Phoenix Capital Group, *Revised Business Plan for Globe Savings Bank, F.S.B.* at 13, 17–18, 31–32 (Mar. 10, 1987));

---

**3.** According to the Plaintiffs, Phoenix had not yet been legally formed at the time the proposal was submitted in its name.

**4.** In its initial proposal, this new stock association was to be known as "OK Federal Savings Bank;" the name of the new entity was subsequently changed to Globe.

**5.** Phoenix's business plan was a risk-controlled arbitrage regimen. The plan called for the purchase of mortgage-backed securities funded through reverse repurchase agreements, deposits, collateralized mortgage obligations, medium-term notes and advances, and supported by the regulatory capital allowances. Phoenix did not intend to engage in wide-scale residential mortgage lending.

*id.,* Ex. 8 at App. 303–21 (Letter from G.E. Shaughnessy, Phoenix, to R. Sahadi, FHLBB (May 28, 1987)). Throughout these revisions, the aggressive leveraging of the capital credit and supervisory goodwill remained a part of Phoenix's business plan. Contemporaneous memoranda from FHLBB personnel reflect an understanding by the Bank Board that Globe's proposed growth was to be supported by this regimen.[6] *See, e.g., id.,* Ex. 10 at App. 336–37 (FHLBB Memorandum from J. Sconyers to K. Mowbray 11–12 (June 29, 1987)).

Phoenix's application for the supervisory conversion and acquisition of OK Federal was approved by the Bank Board on July 22, 1987. In the approving FHLBB resolution (the "FHLBB Resolution"), the Bank Board resolved that the transaction was to be treated in accordance with generally accepted accounting principles ("GAAP"), except that:

(a) Push-down accounting may be used to reflect the Acquisition on the books of Globe;

(b) The cash contributions by the FSLIC to Globe, pursuant to the Assistance Agreement, may be deemed a contribution to regulatory capital and may be booked as a direct credit to Globe's regulatory capital; and

(c) The value of any unidentifiable intangible assets resulting from the Acquisition may be amortized by Globe over a period not to exceed 25 years by the straight line method.

Pls.' "Short–Form" Motion App., Ex. 12 at App. 355 (FHLBB Resolution 87–793, *Supervisory Conversion of OK Federal Savings and Loan Association, El Reno, Oklahoma, and Acquisition by Phoenix Capital Group, Inc., Wichita, Kansas,* at 7 (July 22, 1987)).

The FHLBB Resolution further authorized and directed the Bank Board Secretary to send a letter to Globe concerning the regulatory forbearances to be adopted by the Bank Board and the Corporation. This forbearance letter (the "Forbearance Letter"), issued on July 30, 1987, specifically stated:

(3) The initial cash contribution to be made to Globe pursuant to section 3(a) of the Assistance Agreement to be entered *into* between the FSLIC and Globe is to be a credit to Globe's regulatory capital; therefore, *for regulatory accounting purposes, Globe may book such initial cash contribution as a direct addition to its regulatory capital.*

(4) *For purposes of reporting to the Board, the value of any unidentifiable intangible asset resulting from accounting for the initial FSLIC cash contribution as a credit to Globe's capital will be amortized by Globe over a period not to exceed 25 years by the straight-line method* and shall not be subject to adjustment subsequent to the initial recordation of the transaction other than for (i) such amortization, (ii) the reduction of such goodwill upon the receipt of cash assistance from the FSLIC pursuant to Sections 4(a)(1) and (2) of the Assistance Agreement, (iii) the reduction of such goodwill from the disposition of assets acquired as contemplated and required by Paragraph 7 of Statement of Financial Accounting Standards No. 72, *Accounting for Certain Acquisitions of Banking or Thrift Institutions,* and (iv) changes in estimates of useful life of the unidentified intangible asset as described in Paragraph 6 of Statement of Financial Accounting Standards No. 72, *Accounting for Certain Acquisitions of Banking or Thrift Institutions.*

(5) For the purposes of reporting to the Board with respect to the books and records of Globe, *push-down accounting* shall be used to record the purchase of Globe's capital stock.

(6) Not later than 90 days following the Effective Date of the acquisition, Globe shall submit to the Principal Supervisory Agent an independent certified public accountant's opinion that Globe has accounted for the transaction in accordance with generally accepted account-

---

6. This Court, however, is mindful of the fact that the business plan provides only a short-term sketch of Phoenix and Globe's plans. Moreover, this Court makes no finding at this time that the growth rate suggested in the plan was accurate, reasonably probable, or even possible to obtain.

ing principles except that as herein provided for purposes of reporting to the Board: (a) push-down accounting shall be used to reflect the conversion and acquisition on Globe's books; (b) the initial cash contribution by the FSLIC to Globe with respect to OK pursuant to the Assistance Agreement shall be deemed a contribution to regulatory capital and may be booked as a direct credit to the regulatory capital of Globe, and (c) the value of any resulting unidentifiable intangible asset may be amortized by Globe over a period not to exceed 25 years by the straight line method.

Pls.' "Short–Form" Motion App., Ex. 13 at App. 363 (Forbearance Letter from Secretary, FHLBB to Globe Savings Bank, F.S.B. at 2 (July 30, 1987)) (emphasis added).

Globe was created on July 31, 1987, as a result of the conversion of OK Federal from a federal mutual savings and loan association to a federal stock savings bank, and all of the common stock of Globe was purchased by Phoenix. At the same time, Phoenix, Globe, and the FSLIC entered into an Assistance Agreement and a Regulatory Capital Maintenance Agreement ("RCMA") for the acquisition of Globe by Phoenix. Phoenix, Globe, the FSLIC, and the FHLBB further executed an Operating Agreement on this date.

Under the terms of the Assistance Agreement, Phoenix was required to invest $3 million in cash into Globe and to furnish the FHLBB with a $3 million irrevocable letter of credit. The FSLIC, in turn, was obliged to make an initial cash contribution to OK Federal equal to the amount of OK Federal's historical regulatory net worth deficit (as of July 31, 1987) plus $5 million. The Assistance Agreement broadly defined the scope of the entire agreement between Globe, Phoenix, and the Government to include "any interpretation or understanding agreed to in writing by the parties," as well as "any resolutions or letters concerning the Conversion, the Acquisition or this [Assistance] Agreement issued by the Bank Board or the COR-

PORATION in connection with the approval of the Conversion, the Acquisition and this [Assistance] Agreement." Pls.' "Short–Form" Motion App., Ex. 14 at App. 458 (Assistance Agreement among the FSLIC, Globe, and Phoenix § 21 at 89 (July 31, 1997) ("Assistance Agreement")).

With regard to the forbearances at issue in this case, the Assistance Agreement contained a specific Accounting Principles clause that provided:

> Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by GAAP as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or *any resolution or action of the Bank Board approving or relating to the Conversion, the Acquisition or this Agreement,* then this Agreement, such regulations, or such resolution or action shall govern. * * * *If there is a conflict between such regulation and the Bank Board's resolutions and actions relating to the Conversion, the Acquisition or this Agreement, the Bank Board's resolutions and actions shall govern.*

*Id.,* Ex. 14 at App. 453 (Assistance Agreement § 16 at 84) (emphasis added). Finally, the Assistance Agreement also explicitly stated that:

> For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by GAAP, all cash contributions made under this § 3 shall be credited to [Globe's] net worth account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 51 Fed.Reg. 33,565 (1986) (to be codified at 12 C.F.R. § 561.13 (1987)).

*Id.,* Ex. 14 at App. 393 (Assistance Agreement § 3 at 24).

Ultimately, the FSLIC contributed cash to Globe totaling approximately $54.8 million.[7] Globe used the capital credit forbearance to

---

7. The FSLIC also later agreed to pay Globe an additional $3.85 million to resolve all disputes regarding the amount of assistance payments owed under section 3(a) of the Assistance Agreement.

credit this amount to regulatory capital. Globe further reported approximately $6.8 million of supervisory goodwill through the use of push-down accounting. Pursuant to the FHLBB Resolution and the Forbearance Letter, Globe was permitted to amortize the capital credit and goodwill over a period of up to 25 years.[8]

### C. The Financial Institutions Reform, Recovery and Enforcement Act

While Globe had been promised certain regulatory forbearances in its agreements with the FHLBB and the FSLIC, Congress drastically altered the regulatory environs effectively to forbid the use of a number of these forbearances with the enactment of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") on August 9, 1989. Pub.L. No. 101–73, 103 Stat. 183 (1989). *See generally, Winstar III*, 518 U.S. at 856–58, 116 S.Ct. 2432. Specifically, FIRREA established three new capital standards: (1) "tangible" capital, which was to be maintained "in an amount not less than 1.5 percent of the savings association's total assets;" (2) "core" capital, which was to be maintained "in an amount not less than 3 percent of the savings association's total assets;" and (3) "risk-based" capital, which was to be maintained at a level that was not to be "materially" lower than that required of national banks. 12 U.S.C. § 1464(t) (1994). Under FIRREA, unidentifiable intangible assets (such as supervisory goodwill) could not be counted towards "tangible" capital, were to be phased out of calculations for "core" capital by 1995, and had to be amortized over 20 years for the purposes of calculating "risk-based" capital. *Id.* § 1464(t)(3)(A), (t)(9)(A)-(C). Finally, the Act abolished the FSLIC and created a new insurance fund to be managed by the Federal Deposit Insurance Corporation (the "FDIC"). The Act also replaced the Bank Board with the Office of Thrift Supervision (the "OTS"), and established the Resolution Trust Corporation to liquidate or otherwise dispose of certain closed thrifts and their assets. *Id.* §§ 1441a, 1821.

FIRREA required the OTS to "prescribe and maintain uniformly applicable capital standards for savings associations" in accordance with the requirements of the statute. 12 U.S.C. § 1464(t)(1)(A). To this end, the OTS was to promulgate new final regulations implementing FIRREA within 90 days of enactment of the statute, to take effect within 120 days of enactment. *Id.* § 1464(t)(1)(D). The OTS issued these interim final regulations on November 8, 1989, and the regulations were scheduled to go into effect on December 7, 1989. 54 Fed.Reg. 46,845 (1989).

In September 1989, prior to the promulgation of the interim regulations, the Plaintiffs had asserted to the OTS that FIRREA should not be interpreted as having affected Globe's ability to include the capital credit as regulatory capital. After the interim regulations had been promulgated but before they took effect, on November 17, 1989, Globe received a letter from the OTS advising Globe of the interim final regulations and warning the thrift that it would fail to meet the new capital requirements under these regulations. The OTS therefore required Globe to prepare to submit a capital restoration plan or to provide evidence that it met the new standards by January 8, 1990. Pls.' "Short–Form" Motion App., Ex. 24 at App. 581 (Letter from R. Karr, OTS to B. Grager, Globe at 2 (Nov. 17, 1989)). On December 22, 1989, the OTS again wrote to Globe to advise the thrift that the "existing forbearances * * * will not be extended nor will new forbearances be granted." *Id.*, Ex. 25 at App. 582 (Letter from R. Karr, OTS to W. Williams, Globe (Dec. 22, 1989)). Once again, the OTS advised Globe to prepare to submit a capital restoration plan.

On January 9, 1990, the OTS issued Thrift Bulletin No. 38–2, notifying the thrift industry that FIRREA eliminates forbearances previously granted to certain thrifts and advising "[a]ll savings associations presently operating with these [capital and accounting] forbearances * * * should eliminate them in

---

8. Globe chose to amortize the capital credit over 25 years, but amortized the goodwill over the useful life of the asset (12.5 years).

determining whether or not they comply with the new minimum regulatory capital standards." Office of Thrift Supervision, *Capital Adequacy: Guidance on the Status of Capital and Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund*, Thrift Bulletin No. 38–2, 1990 WL 309397 at *1 (Jan. 9, 1990). Nevertheless, between January and April 1990, Globe made several requests to the OTS to grant the thrift an "exception" for the capital credit. The OTS ultimately rejected Globe's request and on April 23, 1990, the OTS wrote to Globe, stating that "Thrift Bulletin Nos. 36a and 38–2 have established that all capital forbearances * * * have been superceded by the passage of the FIRREA. Globe's accounting forbearance has been determined to be in effect a capital forbearance." Pls.' "Short–Form" Motion App., Ex. 28 at App. 610 (Letter from L. Roy, OTS to W. Williams, Globe (Apr. 23, 1990)). The OTS warned that "[a]ccording to this Office's review, Globe is in noncompliance with its minimum capital requirements for tangible, core, and risk-based capital given the post-FIRREA status of the accounting forbearance." *Id.* On July 27, 1990, Globe received another letter from the OTS reiterating that FIRREA "superceded the accounting forbearance of The Globe Savings Bank, F.S.B. (Globe); therefore, Globe does not currently meet its tangible and core capital requirements." *Id.*, Ex. 29 at App. 611 (Letter from L. Roy, OTS to W. Williams, Globe (July 27, 1990)).

The OTS's correspondence made clear that Globe could no longer count the supervisory goodwill or the FSLIC's cash contribution as direct credits toward regulatory capital. In order to comply with the OTS standards, Globe choose to shrink its assets to raise its capital-to-assets ratio. Globe allegedly sold the bulk of its branch network, a large percentage of its performing loans, many of its fixed assets, and a substantial portion of its investment portfolio. By the end of 1990, Globe had shrunk its assets from more than $700 million to a little more than $70 million.

## D.   Procedural History

On October 29, 1991, Globe and Phoenix filed a Complaint in this Court against the Defendant alleging breach of contract ("Count I"), uncompensated Fifth Amendment takings ("Count II"), denial of due process ("Count III"), and unjust enrichment ("Count IV"). The case was assigned to then-Chief Judge Smith and was subsequently stayed by order of this Court, pending the outcome of the appeals of the *Winstar* and *Statesman* decisions. *See Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990) (finding an implied-in-fact contract), *clarified*, 25 Cl. Ct. 147 (1992), *supplemented*, 25 Cl.Ct. 541 (1992) (finding breach of contract and entering summary judgment on liability), *Statesman Sav. Holding Corp. v. United States*, 26 Cl.Ct. 904 (1992) (entering summary judgment on liability), *rev'd and remanded*, 994 F.2d 797 (Fed.Cir.1993), *reh'g en banc granted and judgment vacated*, 994 F.2d 797 (Fed. Cir.1993), *reh'g en banc*, 64 F.3d 1531 ("*Winstar II*"), *cert. granted*, 516 U.S. 1087, 116 S.Ct. 806, 133 L.Ed.2d 753 (1996), *aff'd and remanded*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

On July 1, 1996, the United States Supreme Court issued its opinion in *Winstar III*, upholding the trial court's determination that FIRREA had breached the Government's contracts to provide the *Winstar* plaintiffs with special accounting allowances. *Winstar III*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964. On July 23, 1996, the Defendant moved this Court to adopt special case management procedures for all the *Winstar*-related cases. In response to this motion, the Court issued an Omnibus Case Management Order on September 18, 1996. The Order set forth optional procedures that permitted the plaintiffs in all *Winstar*-related cases to each file a "short-form" motion for partial summary judgment on liability for breach of contract.[9]

---

9.   The plaintiffs were permitted to file a motion for summary judgment regarding two issues under this Order: whether there was a *Winstar*-type contract and whether FIRREA was inconsistent with that contract. The defendant was given an extended time period to respond via a two-step procedure: within 60 days, the defendant was required to file a response to the formation and breach issues; and within 120 days, the defendant was required to raise any defenses. Fur-

The Plaintiffs in this matter filed a "short-form" motion for partial summary judgment on liability on March 27, 1997. The Defendant responded to the "short-form" motion on June 27, 1997, and cross-moved for summary judgment. The Plaintiffs replied in support of their "short-form" motion on September 9, 1997, and the Defendant replied in support of its cross-motion on October 23, 1997.

In the meantime, then-Chief Judge Smith had begun to hold consolidated hearings on "common issues" in four *Winstar*-related cases. On December 22, 1997, this Court issued its decision in *California Federal v. United States*, 39 Fed.Cl. 753 (1997) (*"California Federal I"*), resolving all common issues in favor of the plaintiffs in the four cases.[10] The Court contemporaneously issued an Order to Show Cause for the other *Winstar*-related cases.

On February 20, 1998, the Government responded to the Court's Order to Show Cause, objecting to the legitimacy of the common issues proceeding in *California Federal I*. On March 11, 1998, this Court directed all plaintiffs in the *Winstar*-related cases with a pending summary judgment motion to submit a proposed order granting partial summary judgment as to liability. The Plaintiffs filed their Motion for Entry of Proposed Order Granting Partial Summary Judgment on Liability on March 31, 1998. The Government responded to the Plaintiffs' Proposed Order on April 30, 1998, and the Plaintiffs filed their reply on May 22, 1998.

The Defendants further moved to dismiss or, in the alternative, for summary judgment with regard to Counts II, III, and IV of the Plaintiffs' Complaint on September 14, 1999. The Plaintiffs responded in opposition on November 2, 1999, asserting that briefing on such issues was subject to a stay. On November 30, 1999, the Defendant replied in support of its Motion.

Thereafter, this case was reassigned to the present judge. After a March 20, 2001 status conference before this Court, the Plaintiffs moved on April 3, 2001, voluntarily to amend their Complaint to withdraw Counts II, III, and IV. Accordingly, on April 30, 2001, the Court ordered that Counts II, III, and IV of the Complaint were to be dismissed, and judgment was entered on the same day dismissing those Counts from the Complaint.

Given the substantial length of time since the Plaintiffs had initially filed their "short-form" motion (March 27, 1997), this Court issued an Order on February 15, 2002 requiring the parties to supplement their "short-form" motion filing. In order to make certain that the factual record was complete, this Court further required the parties to file Statements of Uncontroverted Facts/Genuine Issues with the Court. The Plaintiffs and the Defendant have complied with this Order, and this case is now ready for disposition with regard to liability. Oral argument is deemed unnecessary.

*Discussion*

The United States Supreme Court has recognized that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 1).[11] *See also Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560–61 (Fed.Cir.1988). Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") allows for this Court to render summary judgment in a case when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

---

ther, the Government was not required to file an answer, and the parties were relieved of their obligation to file proposed findings of fact and a statement of genuine issues.

**10.** *California Federal I* subsequently was affirmed on appeal. *California Fed. v. United States*, 245 F.3d 1342 (Fed.Cir.2001).

**11.** RCFC 1 similarly provides that the rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."

fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987).

An issue is genuine only if it might prompt a reasonable jury to resolve a factual matter in favor of the nonmoving party. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). A material fact is one that is relevant under the applicable law. *See id.* at 1567. Further, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. "If the evidence [of the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

When both parties have cross-moved for summary judgment, such as in the present case, each party's motion must be evaluated on its own, drawing all reasonable presumptions and inferences against the party whose motion is being considered. *See Mingus Constructors*, 812 F.2d at 1391. This Court is not required to grant summary judgment to one of the parties merely because both parties have moved for it; the Court has a duty to evaluate independently each party's motion on its individual merits. *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors*, 812 F.2d at 1391). Nevertheless, when a party has cross-moved for summary judgment on an identical issue of law, asserting that there is no genuine issues of material fact, such assertions will be taken into consideration by the Court. *See Mingus Constructors*, 812 F.2d at 1391.

The principal issue before this Court is one of contract interpretation. "It is beyond dispute that the interpretation of the terms of a contract is a matter of law, not a matter of fact, and a court may properly order summary judgment on these issues." *Stone Forest Indus. v. United States*, 32 Fed.Cl. 424, 426 (1994) (citing *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed.Cir. 1991)). *See also Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996); *Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir.1996); *Nematollahi v. United States*, 38 Fed.Cl. 224, 230 (1997). Moreover, there are no genuine issues as to any material fact with regard to liability in the present case. This action, therefore, is ripe for summary disposition.

The parties agree that there are only two liability-related issues in dispute in this case, both of which present purely legal questions for analysis. These two issues are: (1) whether or not the FHLBB possessed sufficient statutory authority to guarantee a holding company, such as Phoenix, against the risk of regulatory change (the "authority" issue); and (2) whether the Government or the Plaintiff agreed to bear the risk of regulatory change (the "successor regulation" issue).[12] The authority issue only affects whether or not plaintiff Phoenix had a valid contract with the Government and has no direct impact on plaintiff Globe's ability to pursue this action. However, because the authority issue goes to the preliminary issue of contract formation, rather than the terms of such a contract, this Court will resolve the authority issue first.

### A. Authority to Contract

◼ In order to have a valid contract with the Government, the Government agency that created or ratified the agreement has to have had actual authority to bind the Govern-

---

12. The Plaintiffs allege that the Government previously had conceded that the only issue left to decide in this case was the authority issue. The Court finds this contention without merit. The Government has stated that if the *California Federal I*, 39 Fed.Cl. 753 (1997), common-issues proceeding was to be treated as creating the "law of the case" for all *Winstar* cases, without any regard to potential contractual distinctions, the only remaining issue to decide would be the authority issue. Nevertheless, the Government never appears to have acknowledged that *California Federal I* was the law of the case. Moreover, any such purported concessions occurred prior to the results of the Government's appeal to the Federal Circuit in *California Federal II*. This Court agrees with the Government that it had not conceded the successor regulation issue.

ment. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). "[T]he Government, unlike private parties, cannot be bound by the apparent authority of its agents." *Roy v. United States*, 38 Fed.Cl. 184, 187 (1997).

■ The Defendant asserts that the FHLBB lacked the authority to guarantee a holding company, such as Phoenix, against the risk of a loss resulting from regulatory change. According to the Government, while the FHLBB had the authority to guarantee "insured institutions" against loss under subsection 1729(f)(2) of the statute, this subsection is inapplicable to holding companies. *See* 12 U.S.C. § 1729(f)(2) (1988 ed.) (repealed). Instead, the Government argues, subsections 1730a(m) and 1729(f)(3) limit the Bank Board to providing "financial assistance" to holding companies. *See id.* §§ 1729(f)(3), 1730a(m). The Government further contends that "financial assistance" cannot include a "guarantee against loss" and that the Government's purported promise to assume the risk of regulatory change is such a "guarantee against loss."

The Defendant is correct to the limited extent that it asserts that subsection 1729(f)(2) only directly applies to transactions in which a healthy FSLIC-insured thrift acquires an ailing FSLIC-insured thrift. Subsection 1729(f)(2) provides that:

the Corporation is authorized, in its sole discretion and upon such terms and conditions as the Corporation may prescribe—

(i) to purchase any such assets or assume any such liabilities;

(ii) to make loans or contributions to, or deposits in, or purchase the securities of, such other insured institution * * *;

(iii) to guarantee such other insured institution * * * against loss by reason of such other institution's merging or consolidating with or assuming the liabilities and purchasing the assets of such insured institution; or

(iv) to take any combination of the actions referred to in clauses (i) through (iii).

12 U.S.C. § 1729(f)(2) (1988 ed.) (repealed). This subsection, however, only applies to "a merger or consolidation of an insured institution * * * with another insured institution or the sale of assets of such insured institution and the assumption of such insured institution's liabilities by another insured institution * * *." *Id.* Thus, subsection 1729(f)(2) cannot directly be applied to acquisition of the control of OK Federal, an FSLIC-insured thrift, by Phoenix, a holding company.

The Defendant's broader argument that the FHLBB did not have the authority under the statute to enter into a contract with Phoenix, however, runs directly counter to the established case law on point and to the plain language of the statute.

The controlling case law clearly indicates that the FHLBB and the FSLIC had broad authority to enter into contracts. *See Winstar III*, 518 U.S. at 890–91, 116 S.Ct. 2432; *California Fed. Bank v. United States*, 245 F.3d 1342, 1348 (Fed.Cir.2001) ("*California Federal II*"); *Winstar II*, 64 F.3d at 1548. In *California Federal II*, for example, the Federal Circuit tersely reminded the Defendant that they had "already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative." 245 F.3d at 1347 (citing *Winstar II*, 64 F.3d at 1548). The Federal Circuit referenced its prior holding in *Winstar II*, which provided, in pertinent part:

We are also persuaded, as the Court of Federal Claims held, that the Bank Board and the FSLIC, as the principal regulators of the thrift industry, *were fully empowered to enter into the contracts at issue here*. Since its inception, the FSLIC has had the power "[t]o make contracts." 12 U.S.C. § 1725(c)(3) (repealed). The FSLIC and its supervisory agency, the Bank Board, have had the authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed), and to set minimum capital limits on a case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed). Although the FSLIC's authority to provide assistance could not exceed the cost of liquidating the thrift, in each of the trans-

actions on appeal the government was saving millions of dollars over the cost of liquidation.

64 F.3d at 1548 (emphasis added).

The Federal Circuit's reasoning in *Winstar II* on this point explicitly was affirmed by the Supreme Court in *Winstar III*. The plurality opinion in *Winstar III* provided that:

> *There is no question, conversely, that the Bank Board and FSLIC had ample statutory authority to do what the Court of Federal Claims and the Federal Circuit found they did do,* that is, promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible. The organic statute creating FSLIC as an arm of the Bank Board, 12 U.S.C. § 1725(c) (1988 ed.) (repealed 1989), generally empowered it "[t]o make contracts," and § 1729(f)(2), enacted in 1978, delegated more specific powers in the context of supervisory mergers * * *. Nor is there any reason to suppose that the breadth of this authority was not meant to extend to contracts governing treatment of regulatory capital. Congress specifically recognized FSLIC's authority to permit thrifts to count goodwill toward capital requirements when it modified the National Housing Act in 1987 [citing 12 U.S.C. § 1730h(d) (1988 ed.) (repealed)] * * *. *There is no serious question that FSLIC (and the Bank Board acting through it) was authorized to make the contracts in issue.*

518 U.S. at 890–91, 116 S.Ct. 2432 (emphasis added) (footnote omitted).

The decisions in *Winstar II* and *Winstar III* discussed subsection 1729(f)(2) in holding that the Bank Board and the Corporation had the authority to enter into the contracts at issue, and the Defendant incorrectly asserts that this citation makes the decisions wholly inapplicable to the present case, since subsection 1729(f)(2) only applies to insured institutions. However, at least two of the plaintiffs directly appearing before the Federal Circuit and the Supreme Court in the *Winstar II* and *Winstar III* decisions (the Statesman Group, Inc. and the Winstar Corp.) were nonthrift entities (holding companies) similar to Phoenix. *See* 518 U.S. at 864, 866, 116 S.Ct. 2432. Thus, the *Winstar* decisions could not have relied solely upon subsection 1729(f)(2) as the sole source of the FSLIC's authority to enter into the "contracts in issue," but also must have relied upon the FSLIC's plenary power to enter into contracts, pursuant to subsection 1725(c)(3). This conclusion is buttressed by the expansive language used by the Supreme Court and the Federal Circuit to describe the authority delegated to the FSLIC and the FHLBB. *See, e.g., Winstar III*, 518 U.S. at 890, 116 S.Ct. 2432 (the FSLIC and the FHLBB had "ample statutory authority"); *Winstar II*, 64 F.3d at 1548 (the FSLIC and the FHLBB were "fully empowered to enter into the contracts at issue here."). Thus, while these decisions illustrate certain dimensions of the FSLIC's and the FHLBB's authority by discussing subsection 1729(f)(2), the full breadth of the agencies' contractual authority is properly found in subsection 1725(c)(3).[13]

---

**13.** We are aware that some judges on this Court have opined that the existence of a more specific provision on authority makes 12 U.S.C. § 1725(c)(3) superfluous. *See Fifth Third Bank of W. Ohio v. United States,* 52 Fed.Cl. 829, 832–36 (2002) (finding, in the alternative, that the FHLBB had no authority to contract with the plaintiff); *Home Sav. of America v. United States,* 50 Fed.Cl. 427, 441–42 (2001). Specifically, these judges have reasoned that subsection 1729(f)(2) renders the more general recitation of authority found in subsection 1725(c)(3) inapplicable to the question of the FSLIC's or the FHLBB's authority to give assistance in the acquisition of thrift institutions. *Fifth Third Bank,* 52 Fed.Cl. at 834–35; *Home Savings,* 50 Fed.Cl.

at 442 (citing *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)).

While this Court recognizes the general proposition that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand," *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), we do not agree that the more specific provisions of section 1729 limited the FSLIC's general contractual authority, except where it explicitly stated such limitations. Indeed, where Congress wished to use such amendments to limit the FSLIC's authority, it did so using quite explicit language. *See, e.g.,* 12 U.S.C. § 1729(f)(4)(A)-(B)

Finally, even if a more specific delegation of authority is required under the precedent, such a delegation can be found in subsections 1730a(m) and 1729(f)(3) of the statute. Section 1730a(m) dealt with "emergency thrift acquisitions," and was relied upon by the FHLBB to effect Phoenix's acquisition of Globe. Under this section, the Corporation was permitted to "authorize any company to acquire control" of a failing thrift "on such terms as the Corporation shall provide." 12 U.S.C. § 1730a(m)(1)(A)(i)–(ii) (1988 ed.) (repealed). This section literally gives the FSLIC *carte blanche* to set the terms of a contract in an emergency acquisition. Subsection 1729(f)(3) elaborates on the type of assistance that the FSLIC may provide in such a scenario:

> The Corporation may provide any person acquiring control of, merging with, consolidating with or acquiring the assets of an insured institution under section 1730a(m) of this title with *such financial assistance as it could provide an insured institution* under this subsection.

12 U.S.C. § 1729(f)(3). The plain language of the statute allows the FSLIC to provide any company acquiring control of an insured institution under the emergency acquisition provisions, such as Phoenix, with the same financial assistance that it could provide to an insured institution under subsection 1729(f)(2).

Nevertheless, the Defendant argues that these expansive provisions actually serve to limit the FSLIC's authority to assist a company that acquires control of an insured thrift in an emergency thrift acquisition. Specifically, the Defendant focuses on the use of the phrase "financial assistance" in subsection 1729(f)(3). The Defendant argues that "financial assistance" only includes "di-

rect, immediate payments to non-insured entities" and not the ability to enter into a contractual relationship guaranteeing against loss with such institutions. Def.'s Reply in Support of Its Cross–Motion for Summary Judgment 30 (Oct. 23, 1997). Thus, the Defendant reasons, the Bank Board and the Corporation had no authority to contract with Phoenix to bear the risk of regulatory change.

"Financial assistance," however, is an inherently broad term. While this Court will defer to a more limited statutory definition, the term is undefined in the banking statute. Undefined words in a statute "will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). The ordinary meaning of the word "financial" relates to the terms "finance" and "finances," and these terms may be defined as:

1. * * * The science of the management of money and other assets.

2. The management of money, banking, investments, and credit.

3. **finances.** Monetary resources; funds, especially those of a government or corporate body.

4. the supplying of funds or capital.

*See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 682 (3d ed.1996). Thus, if this Court looks to the plain language of the words "financial assistance," subsection 1729(f)(3) would appear to authorize the FSLIC to provide a broad variety of assistance to holding companies.

Using this broad definition, a promise to bear the risk of regulatory change, viewed in complete isolation, might not appear to be

---

("No assistance shall be provided under paragraphs (1), (2), or (3) of this subsection in an amount in excess of that amount which [FSLIC] determines to be reasonably necessary to save the cost of liquidating (including paying the insured accounts of) such insured institution * * *. The Corporation may not use its authority under this subsection to purchase the voting or common stock of an insured institution.") Section 1729 was generally offered to expand and clarify the FSLIC's contractual authority, not to limit it.

Moreover, the decision in *Fifth Third Bank* was only offered in the alternative, while *Home Sav-*

ings dealt with the interaction between these two subsections in a different context. This Court finds other recent decisions upholding the FSLIC's authority under 12 U.S.C. § 1725(c)(3) to be more on point. *See Hometown Fin., Inc. v. United States*, 53 Fed.Cl. 326 (2002); *Franklin Fed. Sav. Bank v. United States*, 53 Fed.Cl. 690 (2002); *Admiral Fin. Corp. v. United States*, 54 Fed.Cl. 247 (2002). *See also Bluebonnet Sav. Bank, F.S.B. v. United States*, 43 Fed. Cl. 69 (1999), *rev'd on other grounds*, 266 F.3d 1348 (Fed.Cir.2001).

wholly "financial" in character. *But see infra* this page. However, the promise to bear the risk of regulatory change must be viewed in concert with the regulatory accounting forbearances. The two promises are integrally bound together; the promise to bear the risk of regulatory change serves to vest the forbearances and give them concrete financial implications. The monetary resources of Globe were directly affected by the forbearances, and while such forbearances were not direct payments to Globe, they were a legitimate cash substitute that provided Globe with the capital it needed to fund its business plan.

Even if the promise to bear the risk of regulatory change is viewed in isolation, the Plaintiffs have shown that in other sections of the Code and the regulations, "financial assistance" may encompass various "guarantees." [14] *See, e.g.,* 31 U.S.C. § 7501(4) (defining "financial assistance" as "grants, contracts, loans [and] loan guarantees, property, cooperative agreements, interest subsidies, insurance, or direct appropriations"); 12 C.F.R. § 614.4120(a) (1987) (authorizing Farm Credit Administration banks to make loans and commitments to eligible cooperatives and to "extend to them other financial assistance, including, but not limited to, discounting notes and other obligations, [and] guarantees * * *."). In particular, the Treasury regulations implementing section 597 of the Internal Revenue Code, which provides for the favorable tax treatment of FSLIC "financial assistance" (provided pursuant to section 1729 of the banking statute), specifically states that "loss guarantee payments" are part of such financial assistance. 26 C.F.R. § 1.5971 (1998). While none of these definitions are controlling, they do make clear that Congress and executive agencies regularly define "financial assistance" to encompass "guarantees." Based on such evidence, and the broad plain language definition of the term "financial," this court must conclude that "financial assistance" includes "guarantees," such as those at issue in this case.

The controlling precedent and the breadth of the term "financial assistance" both provide adequate independent grounds for this Court's holding that the FHLBB and the FSLIC had full authority to contract with a holding company to bear the risk of regulatory change. The contract between Phoenix and the FSLIC does not fail for lack of authority on the part of the FHLBB and the FSLIC to contract with financial holding companies.

**B. Assignment of Risk ("Successor Regulation")**

■ The Defendant also argues that the RCMA clearly assigns the risk of regulatory change to the Plaintiffs. Specifically, they point to section 1(a) of the RCMA, which states, in pertinent part,

the ACQUIRER and the NEW ASSOCIATION shall, except to the extent that the Bank Board has agreed from time to time to forbear from enforcement of regulatory capital requirements against the NEW ASSOCIATION, cause the "regulatory capital," as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1987), or any successor regulation, as now or hereafter in effect, of the NEW ASSOCIATION to be maintained * * *.

Compl. Ex. F (RCMA § 1(a) at 3). The Defendant argues that, unlike the contracts at issue in *Winstar III,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964, the Globe RCMA failed to specifically integrate any contractual forbearances into the agreement. Thus, the Defendant claims that the Globe RCMA made the matter somewhat unclear but in any event did not unmistakably put the risk of future regulatory change on the Government.

While the Defendant is correct in asserting that section 1(a) of the RCMA requires Globe and Phoenix to comply both with the then-current capital regulations and any successor capital regulations, this does not mean that the agreement failed to incorporate the agreed-upon regulatory forbearances. The Defendant's argument would have this Court

---

**14.** For the purposes of this Motion, this Court agrees with the Defendant's contention that a promise to bear the risk of regulatory change may be treated as a "guarantee" against loss. *See Fifth Third Bank,* 52 Fed.Cl. at 832–36.

ignore the plain meaning of the phrase "except to the extent that the Bank Board has agreed from time to time to forbear from enforcement of regulatory capital requirements against the NEW ASSOCIATION * * *." This Court will not do so. The FHLBB Resolution,[15] the Forbearance Letter, and the Assistance Agreement all clearly spell out the instances in which the Bank Board has explicitly agreed to "forbear from enforcement of regulatory capital requirements."

The FHLBB Resolution clearly states that the Globe transaction is to be treated in accordance with generally accepted accounting principles ("GAAP"), except that

> (a) Push-down accounting may be used to reflect the Acquisition on the books of Globe;

> (b) The cash contributions by the FSLIC to Globe, pursuant to the Assistance Agreement, may be deemed a contribution to regulatory capital and may be booked as a direct credit to Globe's regulatory capital; and

> (c) The value of any unidentifiable intangible assets resulting from the Acquisition may be amortized by Globe over a period not to exceed 25 years by the straight line method.

Pls.' "Short–Form" Motion App., Ex. 12 at App. 355 (FHLBB Resolution 87–793, *Supervisory Conversion of OK Federal Savings and Loan Association, El Reno, Oklahoma, and Acquisition by Phoenix Capital Group, Inc., Wichita, Kansas*, at 7 (July 22, 1987)). Similarly, the Forbearance Letter provides:

> (3) The initial cash contribution to be made to Globe pursuant to section 3(a) of the Assistance Agreement to be entered into between the FSLIC and Globe is to be a credit to Globe's regulatory capital; therefore, *for regulatory accounting purposes, Globe may book such initial cash contribution as a direct addition to its regulatory capital.*

> (4) *For purposes of reporting to the Board, the value of any unidentifiable intangible asset resulting from accounting for the initial FSLIC cash contribution as a credit to Globe's capital will be amortized by Globe over a period not to exceed 25 years by the straight-line method* and shall not be subject to adjustment subsequent to the initial recordation of the transaction other than for (i) such amortization, (ii) the reduction of such goodwill upon the receipt of cash assistance from the FSLIC pursuant to Sections 4(a)(1) and (2) of the Assistance Agreement, (iii) the reduction of such goodwill from the disposition of assets acquired as contemplated and required by Paragraph 7 of Statement of Financial Accounting Standards No. 72, *Accounting for Certain Acquisitions of Banking or Thrift Institutions,* and (iv) changes in estimates of useful life of the unidentified intangible asset as described in Paragraph 6 of Statement of Financial Accounting Standards No. 72, *Accounting for Certain Acquisitions of Banking or Thrift Institutions.*

> (5) For the purposes of reporting to the Board with respect to the books and records of Globe, *push-down accounting* shall be used to record the purchase of Globe's capital stock.

> (6) Not later than 90 days following the Effective Date of the acquisition, Globe shall submit to the Principal Supervisory Agent an independent certified public accountant's opinion that Globe has accounted for the transaction in accordance with generally accepted accounting principles except that as herein provided for purposes of reporting to the Board: (a) push-down accounting shall be used to reflect the conversion and acquisition on Globe's books; (b) the initial cash contribution by the

---

**15.** While the FHLBB resolution is an agency document "the Court in *Winstar* resolved the contractual nature of the totality of the agreements, promises, and undertakings relating to the assumption of liabilities, purchase accounting, and the treatment of supervisory goodwill and its amortization." *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1369 (Fed.Cir.2003). Moreover, the Assistance Agreement explicitly encompasses such resolutions as within the scope of the entire agreement. *See infra* 262.

FSLIC to Globe with respect to OK pursuant to the Assistance Agreement shall be deemed a contribution to regulatory capital and may be booked as a direct credit to the regulatory capital of Globe, and (c) the value of any resulting unidentifiable intangible asset may be amortized by Globe over a period not to exceed 25 years by the straight line method.

Pls.' "Short–Form" Motion App., Ex. 13 at App. 363 (Forbearance Letter from Secretary, FHLBB to Globe Savings Bank, F.S.B. at 2 (July 30, 1987)) (emphasis added). Finally, the Assistance Agreement contained an Accounting Principles clause that provided:

Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by GAAP as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or [FSLIC], or *any resolution or action of the Bank Board approving or relating to the Conversion, the Acquisition or this Agreement*, then this Agreement, such regulations, or such resolution or action shall govern. * * * *if there is a conflict between such regulations and the Bank Board's resolutions and actions relating to the Conversion, the Acquisition or this Agreement, the Bank Board's resolutions and actions shall govern.*

Pls.' "Short–Form" Motion App., Ex. 14 at App. 453–54 (Assistance Agreement § 16 at 84–85) (emphasis added). The Assistance Agreement also stated that:

For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by GAAP, all cash contributions made under this § 3 shall be credited to [Globe's] net worth account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 51 Fed.Reg. 33,565 (1986) (to be codified at 12 C.F.R. § 561.13 (1987)).

*Id.*, Ex. 14 at App. 393 (Assistance Agreement § 3 at 24).

These three documents (as well as the Operating Agreement) are integrated togeth-er with the RCMA to form the entire agreement through the Assistance Agreement, which defines the scope of the contract as including "any interpretation or understanding agreed to in writing by the parties," as well as "any resolutions or letters concerning the Conversion, the Acquisition or this [Assistance] Agreement issued by the Bank Board or [FSLIC] in connection with the approval of the Conversion, the Acquisition and this [Assistance] Agreement." *Id.*, Ex. 14 at App. 458 (Assistance Agreement § 21 at 89). Similarly, the RCMA states in section 12 that:

[t]his [Regulatory Capital Maintenance] Agreement, *together with any interpretation or understanding agreed to in writing by the* parties, constitutes the entire agreement among the parties and supercedes all prior agreements and understandings of the parties in connection with the subject matter hereof.

Compl. Ex. F (RCMA § 12 at 13–14) (emphasis added). Thus, when the RCMA states that regulatory capital is to be defined by the current and successor regulations "except to the extent that the Bank Board has agreed from time to time to forbear from enforcement of regulatory capital requirements against the NEW ASSOCIATION," the accounting forbearances found in the FHLBB Resolution, the Forbearance Letter, and the Assistance Agreement must be treated as such exceptions.

Moreover, if the Defendant's argument was correct, the phrase "except to the extent that the Bank Board has agreed from time to time to forbear from enforcement of regulatory capital requirements against the NEW ASSOCIATION" would be wholly superfluous. While the Government argues that the phrase "has agreed," may be read as "may agree to in the future," this reading does not comport with the actual language of the RCMA. The RCMA uses the present perfect tense of the verb "agree," clearly denoting an act that has been completed. *See Barrett v. United States*, 423 U.S. 212, 216, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976). As a matter of simple grammar and syntax, this phrase must refer to the forbearances integrated into the contract through the Assistance Agreement.

Finally, this Court notes that the successor regulation issue has already been effectively

decided by *California Federal*, which resolved "dispositively any common issues for the remaining *Winstar*-related cases." *California Federal II*, 245 F.3d at 1344. *See also Citizens Fed. Bank, F.S.B. v. United States*, 51 Fed.Cl. 682, 689 (2002). While this Court is quite willing to review a purported *Winstar*-contract for *material* differences that might mandate a different result, in this case, there are none. Just as in the *California Federal* case in which the parties had specifically agreed to a contract, the parties in this case likewise had agreed to be bound. *See also Admiral Fin. Corp. v. United States*, 54 Fed.Cl. 247, 256–58 (2002). *But see South-Trust of Georgia, Inc. v. United States*, 54 Fed.Cl. 741 (2002) (finding that the RCMA permitted the Government to change the rules without liability).

The Globe RCMA specifically integrated the regulatory accounting forbearances found in the FHLBB Resolution, the Forbearance Letter, and the Assistance Agreement, and the Defendant unmistakably contracted to assume the risk of regulatory change. The contract that was formed in this assisted supervisory transaction subsequently was breached by the Government when it enacted FIRREA. The Government therefore is liable for any damages resulting from its breach.

### CONCLUSION

For the foregoing reasons, the Plaintiffs' "Short–Form" Motion for Partial Summary Judgment on Liability is GRANTED, and the Defendant's Cross–Motion for Summary Judgment (as to liability) is DENIED. This Court makes no ruling at this time with regards to damages.

The parties are ORDERED to file, on or before February 26, 2003, a status report (joint, if possible) as to their views on future proceedings regarding damages in this case.