**SOUTHTRUST OF GEORGIA, INC.,** f/k/a **Bankers First Corporation, and Southtrust Bank of Georgia, N.A.,** f/k/a **Bankers First Savings Bank, FSB, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 95–773C.

United States Court of Federal Claims.

Dec. 19, 2002.

Stephen M. Forte, Atlanta, GA, for plaintiffs. Thomas M. Barton and Shannan L. Freeman, of counsel.

Henry R. Felix, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant.

## OPINION

FIRESTONE, Judge.

This case is one of the cases related to *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*"Winstar"*). In *Winstar*, the Supreme Court ruled that passage of the Financial Institutions Reform, Recovery, and Enforce-

ment Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA") (codified as amended in various sections of Title 12 of the United States Code), caused a breach of the contract that the government and Winstar had entered into in connection with Winstar's takeover of a failing thrift. The plaintiffs in this case seek to extend the holding in *Winstar* to their circumstances. The matter is presently before the court on the parties' cross-motions for summary judgment on liability with respect to the plaintiffs' breach of contract claims.

Plaintiffs allege that, as in *Winstar*, the passage of FIRREA resulted in a breach of the promises made in their agreement with the government when Bankers First Corporation ("BFC") acquired Southeast Federal Savings Bank ("Southeast"). The government argues that no contract existed between the government and BFC, or in the alternative, that even if there were a contract, the plaintiffs retained the burden of regulatory change, and thus FIRREA did not result in the breach of any contract between the government and the plaintiffs.

For the reasons that follow, the court concludes that there was no contract regarding the plaintiffs' right to continued use of goodwill and that the passage of FIRREA did not result in a breach of any contract entered into regarding the government's approval of the plaintiffs' acquisition of Southeast.

## BACKGROUND

### A. Facts

The following facts are not in dispute. In the mid–1980s BFC was looking to expand its holdings' market base in Georgia. As part of that expansion plan, BFC acquired Athens Federal Savings Bank in Athens, Georgia in 1986 and Southeast in Rossville, Georgia in 1987. This case involves the acquisition of Southeast.

Southeast had become noncompliant with regulatory capital requirements due to heavy losses in the mid–1980s. BFC and Southeast began negotiations in May of 1986. BFC

was interested in acquiring Southeast through a voluntary supervisory conversion,[1] where Southeast would change from a mutual bank to a stock federal savings bank, becoming a wholly-owned subsidiary of BFC.

To be eligible for a supervisory conversion, Southeast needed to have losses causing its net worth to fall below zero. In October of 1986, an audit uncovered $4.5 million in loan loss reserve. This loss caused Southeast's net worth to fall below zero and made the thrift eligible to go forward with the voluntary supervisory conversion with BFC.

On December 30, 1986, BFC and Southeast entered into an Agreement and Plan of Reorganization ("Agreement") and a Plan of Merger and Combination ("Merger Plan"), allowing BFC to become the full owner of Southeast. The Agreement for the voluntary supervisory conversion stated that "[n]o approval of this Agreement, the Plan of Conversion or the Plan of Merger is required of the Voting Members of [Southeast]." The conversion still had to be approved by the Federal Home Loan Bank Board ("FHLBB"), and the Merger Plan was conditioned upon regulatory approval.

In keeping with the Agreement, BFC submitted the necessary H-(e)3 Application ("Application") to the FHLBB authorities on January 22, 1987. The Application stated, in relevant part, that:

> The acquisition of Southeast by BFC will be accounted for under the purchase method of accounting. BFC will purchase an amount of the capital stock of Southeast which will equal either 3% of the liabilities of Southeast on December 31, 1996, computed on the basis of generally accepted accounting principles, or the regulatory capital requirements for Southeast established under Section 563.13 of the regulations of the FHLBB. This represents an aggregate purchase price of approximately $6.5 million.
>
> Each of the assets of Southeast will be valued as to their fair market value at the time of the acquisition. The excess, if any,

---

1. A voluntary supervisory conversion is where a single entity acquires all of the stock of a thrift in exchange for contributing enough capital to satisfy regulatory net worth requirements without first receiving account holder approval or offering shares on the market.

of the gross consideration to be paid by BFC above the fair market value of the assets of Southeast acquired, less the liabilities of Southeast as adjusted to fair value assumed in connection therewith, will be deemed to be "goodwill." This goodwill will be reflected on the books of New Southeast and will be amortized over such period as may be permissible and appropriate under applicable accounting standards and the rules and regulations of the FHLBB and [the Securities and Exchange Commission].

The Application listed the goodwill as being amortized over a period of twenty-five years. The Application did not ask for any waivers or supervisory forbearances for this transaction.

On March 9, 1987, the FHLBB responded to the Application by requesting more materials and information. One item that the FHLBB requested was "an opinion of an independent certified public accountant regarding the appropriateness of the accounting treatment for the transaction and the conformity of such accounting treatment to generally accepted accounting principles ...." In addition, the FHLBB asked BFC to confirm that the Application contained no requests for waivers or forbearances.

An internal BFC memorandum, dated March 23, 1987, discussed clarification of the merger and capital requirements in response to FHLBB's request. BFC was:

> proposing to infuse capital equal to or greater of 3% of liabilities or minimum regulatory capital requirement, which would be approximately $6.5 million. We were not proposing to infuse capital to bring [generally accepted accounting practices ("GAAP")] net worth to 3% of GAAP liabilities which would require approximately $10.5 million. I told her I realized we must agree to additional infusions of capital necessary to meet future regulatory capital requirements.

The Application was supplemented on April 7, 1987 and June 4, 1987 in response to the FHLBB's requests for additional or different information. Based on the findings of the requested audit, BFC lowered its requested amortization period of goodwill to ten years. Also included in the April 7th supplement was a letter to the General Counsel of Securities and Corporate Structure that stated, in relevant part:

> [Southeast's] total net worth ... shown in their business plan ... and infusion of $6.5 million [by BFC] represents more than 3% of the liabilities shown in the business plan. As stated in the last sentence of item 10 of [the Application] dated January 22, 1987, BFC stipulated that sufficient additional equity capital would be infused into [Southeast] to meet future minimum regulatory net worth requirements.

The letter also stated that "the application ... contains no requests for waivers or supervisory forbearances ...." The June 4th supplement restated that "the regulatory capital requirement computed under FHLBB regulation 563.13 of $7,449,000 exceeded 3% of liabilities."

On June 17, 1987, the supervisory agent from the FHLBB recommended the voluntary supervisory conversion for full approval. The agent acknowledged after full review of the submitted financial information that "the holding company has the cash resources to consummate the proposed transaction without incurring any acquisition debt." The agent restated, consistent with the submitted Application, that BFC be required to meet all future regulatory capital requirements:

> [T]he applicant shall stipulate to the Corporation that as long as it controls Southeast Federal, it will cause the regulatory capital of Southeast Federal to be maintained at a level consistent with that required by Section 563.13 of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect, and, as necessary, will infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement.

On June 30, 1987, FHLBB approved the merger. The approval letter stated that:

> [A]s long as the Acquiror controls New Institution, it will cause the regulatory capital of New Institution, to be maintained at a level consistent with that required by 12 C.F.R. § 563.13(b) as now or

hereafter in effect, and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement during the first quarter after which New Institution fails to meet its regulatory capital requirement.

The approval letter also required that BFC and Southeast execute a Regulatory Capital Maintenance/Dividend Agreement ("RCMA") once again promising that BFC would maintain Southeast's capital levels "consistent with 12 C.F.R. § 563.13(b) as now or hereafter in effect." Within the RCMA, "regulatory capital requirement" is defined as "the Association's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 563.13(b), or any successor regulation thereto, but not less than 3% of Association's total liabilities." The obligations of the plaintiffs included "undertak[ing] and agree[ing] to maintain the Association's regulatory capital in compliance with the Regulatory Capital Requirement and to cause the Association to comply with the restrictions in 12 C.F.R. §§ 563b.3(g)(2) and (3) and the limitations imposed by Section IV.B of this Agreement . . . ." Furthermore, section VII of the RCMA stated in relevant part:

B. This Agreement shall be deemed a contract made under and governed by the laws of the State of Georgia.

D. This Agreement has been duly authorized, executed, and delivered, and constitutes . . . a valid and binding obligation of [BFC, Southeast] and the [Federal Savings and Loan Insurance Corporation].

As provided for in the approval, BFC paid $7.46 million to Southeast to acquire its stock. Southeast operated as a subsidiary of BFC for five years and acquired approximately $9.9 million of goodwill from the use of purchase accounting. The goodwill was amortized over a period of ten years, rather than the twenty-five years initially requested. That goodwill was included as an asset on the thrift's financial statements. Southeast was a profitable subsidiary of BFC and even paid BFC a $1 million dividend in 1988.

FIRREA was passed in August of 1989. The regulations, implemented on December 7, 1989, mandated that thrifts were no longer allowed to count goodwill toward their capital requirements. By virtue of FIRREA's requirements, Southeast was not allowed to rely on goodwill, and thus Southeast's growth was limited. However, Southeast satisfied all three of FIRREA's new capital requirements.

On June 30, 1992, BFC merged with Southeast under the name Bankers First Savings Bank ("BFSB"). The plaintiffs acquired BFSB in March of 1996. BFSB was merged into SouthTrust Bank and released from the supervision of the Federal thrift regulatory authorities.

## B. The Present Litigation

The plaintiffs filed their suit in this court on November 29, 1995. The complaint named as defendant the United States ("government"). In their complaint, plaintiffs assert that the enactment and implementation of FIRREA amounted to a breach of contract that entitles them to compensatory damages and damages for losses.

On October 10, 2000, the government and plaintiffs filed cross motions for summary judgment on liability. Supplemental briefs were filed in June, 2002. Oral argument was heard on November 25, 2002.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed. Cir.2001) ("*Cal. Fed.*"). At issue on these cross-motions is whether a contract exists and, if so, whether it was breached by FIRREA. This issue presents mixed questions of law and fact. *Cal. Fed.*, 245 F.3d at 1346. In deciding whether summary judgment is appropriate, it is not the court's function to weigh the evidence and determine the truth of the matter, but to determine whether

there is a genuine issue for trial. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505.

## B. Positions of the Parties

The government argues that the supervisory merger and treatment of goodwill does not amount to a contract with the plaintiffs. The government asserts that BFC merely complied with legal regulations to acquire Southeast and that "the review and ultimate approvals given by the regulators were sovereign and regulatory functions, not contractual undertakings." Defendant's Supplemental Brief in Support of Its Motion for Summary Judgment on Liability at 16. Because the plaintiffs only complied with regulations, there was no bargained for exchange to treat the goodwill specially, and in turn, no contract regarding goodwill was formed with the government.

The government notes that the approval letter from the FHLBB only refers to regulatory treatment of goodwill rather than any negotiated treatment. The government also notes that there was no assistance agreement nor any forbearance requested by the plaintiffs or provided for in the agreement with respect to the goodwill. The government states that "all the regulators did ... was to analyze the potential acquisition, request information and documents from the parties to ensure compliance with regulations, and then approve the transaction pursuant to, and consistent with, current regulations." *Id.* at 13.

In the alternative, the government argues that if there is any contract between the parties, it is set forth in the RCMA, and that the RCMA placed any risk of future regulatory change of the capital requirements with the plaintiffs. The government argues that the RCMA contains no promises to the plaintiffs other than the benefits already provided under the existing regulatory scheme allowing the use of goodwill as an asset. The government points to the RCMA's clause detailing the definition of regulatory capital

maintenance as expressly placing the risk of regulatory change on the plaintiffs, specifically, the clause which read "in accordance with 12 C.F.R. 563.13(b), or any successor regulation thereto." Indeed, throughout the history of this transaction, the plaintiffs agreed that they would be bound by any new changes to the regulatory capital requirements.

The government argues that FIRREA, in such circumstances, did not result in a breach of contract. Due to the express terms in the RCMA, the plaintiffs were obligated to meet the FIRREA regulations, and therefore, the change in regulatory capital maintenance requirements set by FIRREA did not constitute·a breach of contract.

The plaintiffs argue in response that they bargained for and obtained from the government a commitment regarding the use of goodwill, which was breached by FIRREA. Plaintiffs contend that they indeed negotiated with the government for "a ten year amortization of the goodwill created by the transaction, and ... the ability to use the goodwill [that] would not be unilaterally taken away a week, a year, or even three years later." Plaintiff's Reply Brief in Support of their Motion for Summary Judgment at 6–7. The plaintiffs argue that they bought Southeast specifically because of the special treatment of goodwill, that "the goodwill treatment was the *raison d'etre* for the transaction in the first instance, and the inducement for the BFC to infuse $7.4 million into an insolvent institution ...." *Id.* at 6, FN 2.[2]

The plaintiffs argue that the amortization schedule was specifically negotiated with the government. The plaintiffs trace the negotiations back to the original January 22, 1987 Application that stated the amortization period to be twenty-five years. The FHLBB then requested modifications, including an independent accounting of the proposed

---

**2.** The plaintiffs do not present any evidence to show that this understanding was ever communicated to the government. Instead, the plaintiffs rely solely on the deposition of Mr. Osteen, BFC's President, who conceded that he did not "negotiate" with the FHLBB over the use of goodwill. Indeed, he reiterated throughout his

deposition that he relied upon the then-existing regulation regarding the use of goodwill in deciding to enter into the merger. He also acknowledged that the government provided in its approval that those regulations could change. Mr. Osteen explained that he did not think those changes would affect goodwill.

transaction and conformity to GAAP. In response, the plaintiffs revised the Application to make the amortization of goodwill ten years. According to the plaintiffs, the formation of a contract is clearly indicated from these exchanges of the regulatory approval documents between the banks and the FHLBB.

The plaintiffs argue that the RCMA plainly demonstrates the existence of a contract. Moreover, the plaintiffs argue that the RCMA placed the burden of change in the regulatory capital maintenance requirements on the government. The plaintiffs argue that like *Winstar*, in which the Supreme Court found that the plaintiffs' commitment to meet new regulations did not undo the government's promises to treat goodwill separate from new regulations, they were not bound by new capital maintenance requirements. Here, the plaintiffs argue that they negotiated for the ten-year amortization of goodwill and the right to use the goodwill for capital requirements. According to the plaintiffs, the promises made in those negotiations demonstrate that the government retained the burden of regulatory change and clearly breached the bargained for exchange through the passage of FIRREA.

## C. There Was no Contract Between the Plaintiffs and the Government Regarding Goodwill

Based on the undisputed facts, this court finds that there was no bargained for exchange between the parties regarding the plaintiffs' right to use goodwill. The only contract between the plaintiffs and the government is set forth in the RCMA, which placed the burden of change in the regulatory capital maintenance requirements on the plaintiffs and, therefore, the passage of FIRREA did not constitute a breach of that contract.

In deciding if there was a contract, this court is guided by *Cal Fed*, which requires that the court determine whether there was a bargained for exchange between the acquirers and the regulators in connection with goodwill. *Cal. Fed.*, 245 F.3d at 1347. What constitutes the evidence necessary to find a bargained for exchange varies from case to case, but examination of cases reveals that the courts require, at a minimum, a special or negotiated treatment of goodwill that the parties understand will be protected from any regulatory change. *See Winstar*, 518 U.S. 839, 116 S.Ct. 2432; *Guaranty Financial Servs., Inc. v. Ryan*, 928 F.2d 994 (11th Cir.1991) ("*Guaranty*"); *Cal. Fed.*, 245 F.3d 1342.

For example, in cases where there was a forbearance agreement addressing the issue of goodwill, courts have found a bargained for exchange. *See Cal. Fed.*, 245 F.3d at 1347 ("the FHLBB and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the forbearance letters."); *see also Franklin Fed. Sav. Bank v. United States*, 53 Fed.Cl. 690 (2002); *Admiral Fin. Corp. v. United States*, 54 Fed.Cl. 247 (2002). Similarly, a contract has been found where the acquirers have negotiated for and have been allowed to use goodwill outside the normal regulatory parameters. *See La Van v. United States*, 53 Fed.Cl. 290 (2002). Finally, in one case a contract regarding goodwill was found where there was an express acknowledgment of how the use of goodwill fit within the business plan and the acquirer committed itself to meet the terms of that business plan. *See Sterling Sav. v. United States*, 53 Fed.Cl. 599 (2002).[3]

Here, however, none of the indicia of a bargained for exchange in connection with goodwill exists. The plaintiffs initiated the

---

**3.** The plaintiffs' reliance on *Sterling* is misplaced. In *Sterling* the court found a contract and that the government retained the burden of regulatory change through that contract. The court relied upon reciprocal resolutions of the bank boards and a business plan, where the plaintiffs agreed to "the execution of a written agreement which provides that for a period of five (5) years following the date of acquisition, this corporation will operate within the scope of the business plan which was provided ...." *Sterling* at 607. Here, once again, the case at hand is plainly distinguishable. The record is absent of any negotiated agreement, such as the negotiated business plan requiring a five year commitment. Instead, the plaintiffs made no such business promises to the government in order to receive the existing regulatory treatment of goodwill and repeatedly promised to follow any new regulatory capital requirements.

acquisition of Southeast. In order to accomplish the acquisition, the plaintiffs stated that they were not seeking any forbearances or waivers from the government regulators. The plaintiffs expressly acknowledged to those regulators that there might be regulatory changes in connection with the then-existing regulatory capital requirements, which allowed the use of goodwill, and acknowledged that they would bear the risk of a regulatory change if one occurred. Indeed, there is no evidence of any actual arms-length negotiations between the plaintiffs and the government regarding the use of goodwill. *See Anderson v. United States,* 47 Fed.Cl. 438, 445 (2000). In sum, the plaintiffs' entire case rests on the fact that under the pre-FIRREA regulations, goodwill could be created using the purchase method of accounting and then used for certain regulatory capital purposes. The plaintiffs are in effect asking this court to find that any time the government allowed acquirers to use goodwill for regulatory capital purposes, under the pre–FIRREA regulations, the government entered into a "contract" allowing for the use of that goodwill for the full amortization period. The court finds that *Cal. Fed.* requires more than simple regulatory approval.[4] 245 F.3d at 1347. A careful review of the facts presented by both parties demonstrates that the plaintiffs sought only the use of goodwill that the then-existing regulatory scheme allowed and did not seek or secure any protection for the use of that goodwill for any period of years. Indeed, the plaintiffs agreed to abide by any change in regulatory capital requirements. Under the unique facts of this case, the court finds that there was no contract regarding the plaintiffs' right to continued use of goodwill after FIRREA.

Moreover, plaintiffs' reliance on the RCMA to establish a contract regarding goodwill is misplaced. To the extent that the RCMA was a contract between the parties concerning goodwill, it allowed the government to change the rules without liability.[5] Where, as here, the acquirers expressly committed in the RCMA to meet any new regulatory capital requirements, did not secure protection of that goodwill in the event of a regulatory change, and no other agreement regarding goodwill exists, the court has no basis for finding a breach of contract following the regulatory change occasioned by FIRREA.

## CONCLUSION

Because there are no facts in dispute that would allow the court to find the existence of a contract, which gave the plaintiffs the right to use goodwill for a specified period of time, the government's motion for summary judgment on liability is **GRANTED**. The plaintiffs' motion for summary judgment on contract liability is **DENIED**. Each party to bear its own costs.

---

4. The plaintiffs rely on *Cal. Fed.'s* "totality of the circumstances" proposition to demonstrate that a contract regarding goodwill existed. However, the many documents described in *Cal. Fed.,* which led the Federal Circuit to find a legally binding bargained for exchange, are absent from this factual record. The plaintiffs have failed to show any evidence of goodwill treatment other than the FHLBB's approval of the merger based simply on the existing FHLBB regulation.

5. While this case is not identical to *Guaranty,* it closely resembles it. In *Guaranty,* the 11th Circuit held, and the Supreme Court acknowledged in *Winstar,* 518 U.S. at 869, 116 S.Ct. 2432, that acquirers could agree to assume the risk of a regulatory change and bear the consequences of that change, if they do so expressly. *Guaranty,* 928 F.2d at 1001.