**FIRST COMMERCE CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 92–731C.**

United States Court of Federal Claims.

Jan. 18, 2005.

---

Rosemary Stewart, Washington, DC, for plaintiff.

John N. Kane, Jr., with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. Luke P. Levasseur, Edward P. Sullivan, and James Whitman, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, of counsel.

*OPINION*

HEWITT, Judge.

The court has before it Defendant's Motion for Reconsideration of the Court's May 18, 2004 Liability Opinion, and its Renewed Motion for Summary Judgment upon Liability (Def.'s Mot. or defendant's motion), Plaintiff First Commerce Corporation's Opposition to the Defendant's 9/27/04 Motion for Reconsideration (Pl.'s Opp'n or plaintiff's opposition) and Defendant's Reply Brief in Support of its Motion for Reconsideration of the Court's May 18, 2004 Liability Opinion (Def.'s Reply). For the following reasons, the court GRANTS defendant's motion for reconsideration, VACATES its finding of summary judgment on liability for plaintiff, and GRANTS defendant's renewed motion for summary judgment on liability.

## I. Background [1]

Plaintiff First Commerce Corporation (FCC or First Commerce) contracted with

---

**1.** The background facts of this case are set out in detail in *First Commerce Corp. v. United States,* 53 Fed.Cl. 38, 39–41 (2002) (*First Commerce I*). A detailed account of the facts relevant to con-

the Federal Home Loan Bank Board (FHLBB) in 1987 to acquire a failing thrift. *See First Commerce Corp. v. United States,* 60 Fed.Cl. 570, 573 (2004) (*First Commerce III*). The FHLBB agreed in a forbearance letter to allow amortization of "any intangible assets resulting from the application of push-down accounting in accounting for the purchase" (also known as "supervisory goodwill") for "a period not to exceed 25 years." *Id.* at 574 (footnote and internal quotations omitted). The parties also executed a "Regulatory Capital Maintenance/Dividend Agreement" (RCMA), which stated in relevant part:

> All references to regulations of the Board [FHLBB] or the FSLIC [Federal Savings and Loan Insurance Corporation] used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's [FCC's] obligation under this Agreement.

*Id.* (internal quotations omitted). In 1989, the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) became law, revising the amortization schedule for intangible assets and requiring plaintiff to infuse additional capital into its new bank. *Id.* (citing Pub.L. No. 101–73, 103 Stat. 183 (codified in relevant part at 12 U.S.C. § 1464 (2000))). In 1991, plaintiff's new bank was unable to comply with capital regulatory requirements and went into receivership. *Id.* In 1992, plaintiff filed its complaint in this court, requesting relief on a variety of contract and takings theories. *Id.*

In *First Commerce Corp. v. United States,* 53 Fed.Cl. 38, 39–41 (2002) (*First Commerce I*), this court decided the contract liability issue for the government, finding that no contract had been formed. 53 Fed.Cl. at 48. On appeal, the Federal Circuit approved this court's finding of a "discrepancy between offer and acceptance," but vacated and remanded the *First Commerce I* decision because "the government made a counteroffer to First Commerce." *First Commerce Corp. v. United States,* 335 F.3d 1373, 1376 (Fed. Cir.2003) (*First Commerce II*). The Federal Circuit concluded that the FHLBB forbearance letter was the government's counteroffer, and remanded for "the determination of whether First Commerce accepted the FHLBB's counteroffer." *Id.* at 1382. The Federal Circuit also remanded three defenses presented by the government on appeal which were not addressed by this court in *First Commerce I*: (1) that defendant's agents lacked authority to contract; (2) that defendant acted *ultra vires* by contracting with a holding company such as First Commerce; and (3) that the Regulatory Capital Maintenance Agreement executed between FCC and the government assigned the risk of regulatory change to FCC. *Id.* at 1382–83.

On remand, this court found that FCC accepted the FHLBB's counteroffer through "unambiguous" performance and that bargained-for consideration had indeed been exchanged. *First Commerce III,* 60 Fed.Cl. at 581–82, 585 (finding that plaintiff accepted by conduct when it "acquired [the ailing thrift,] ... utilized the 25–year amortization of goodwill ... [and] complied with all of the conditions set by FHLBB for the acquisition," and relying on Restatement (Second) of Contracts § 80 (1981) to determine that "FCC did bargain for and give consideration for the forbearance related to the 25–year amortization of goodwill because it was one promise of a set of promises made by the government in that counteroffer"). As to the additional defenses on remand, this court determined that, pursuant to statute and regulations, the government agents contracting with FCC had been delegated "actual authority" to contract regarding the goodwill accounting methods at issue, *see First Commerce III,* 60 Fed.Cl. at 585–89 & n. 19, and that the FCC RCMA had "allocate[d] the risk of regulatory change to defendant," *id.* at 596.

---

tract formation issues is provided in *First Commerce Corp. v. United States,* 335 F.3d 1373, 1376–79 (Fed.Cir.2003) (*First Commerce II*). This court's decision finding that a contract existed and granting summary judgment to plaintiff on breach-the decision the court now reconsiders-appears at *First Commerce Corp. v. United States,* 60 Fed.Cl 570 (2004) (*First Commerce III*).

In finding that the contract language allocated the risk of regulatory change to defendant, this court considered three issues: (1) "the contract documents themselves and how their terms should be read"; (2) "the '*Guaranty* footnote' in *Winstar III* concerning when the language of such contract documents allocates the risk of regulatory change to plaintiff or defendant"; and (3) "authority in the Federal Circuit deciding the question of the allocation of risk of regulatory change when similar contract documents are in play." *Id.* at 589 (footnote omitted) (citing *United States v. Winstar Corp.*, 518 U.S. 839, 869 n. 15, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*Winstar III*), for its discussion in a footnote of *Guaranty Fin. Servs., Inc. v. Ryan*, 928 F.2d 994 (11th Cir.1991)).

As to the contract documents themselves, this court examined the forbearance letter and the RCMA, which it found to be the most relevant. *Id.* The forbearance letter promised in paragraph 3 the allowance of goodwill amortization "over a period not to exceed 25 years" and, in its concluding paragraph, clarified that defendant promised no regulatory forbearance or waiver except for that promised "within the preceding paragraphs 1 through 4." *Id.* The third paragraph of the RCMA, entitled "Miscellaneous Provisions," provided in clause VII(D) that:

> [a]ll references to regulations of the Board [FHLBB] or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's [FCC's] obligation under this Agreement.

*Id.* at 590. The court recognized "an apparent..., if not... real[,] conflict between" the contract terms and analyzed the *Guaranty* footnote in *Winstar III* as the "first step in resolving" the conflict. *Id.* at 591.

First, this court noted that the Supreme Court in *Winstar III* focused "on the language of [the] contract documents [at issue in *Guaranty*], not the circumstances of the transaction, when considering the allocation of risk of regulatory change." *Id.* at 592 n. 23; *see also id.* at 592 ("If, indeed, there is a

holding in the *Guaranty* footnote, it appears to rest,... in particular upon the contract documents reviewed.... [and] [b]ecause defendant ... repeatedly asserts that the contract language in *Guaranty* is the same as the contract language in this case, the court reviews" the language of the documents at issue.). Accordingly, the court compared the language of the FCC and Guaranty documents and noted "several differences" between the RCMAs which "appear[ed] to the court to be significant." *Id.* at 593.

The court noted that, in contrast to this court's fuller treatment of the contract issue in *First Commerce I* and *First Commerce III*, the *Guaranty* court's "analysis of contract formation was truncated" because it "'assume[d] without deciding'" that a contract existed. 60 Fed.Cl. at 593 & n. 24 (quoting *Guaranty*, 928 F.2d at 998). Next, the court observed that the *Guaranty* RCMA defined "regulatory capital" and cited specific regulations, whereas the FCC RCMA did not-a difference the court found to be "significant" because "contracting specifically for certain types of assets to qualify as regulatory capital is not the same as contracting for the level of capital that will be needed to remain in regulatory compliance." *Id.* at 593. Finally, the court noted that, in contrast to the Guaranty RCMA, the FCC documents set "a minimum capital ratio of 'not less than 3% of the Association's total liabilities.'" *Id.* at 594. The court then observed that an asterisk incorporated the Guaranty forbearance letter into the Guaranty RCMA, whereas "no such incorporation" occurred in the First Commerce documents. *Id.* However, the "court agree[d] with the parties that the FHLBB forbearance letter and the FCC RCMA must be read together to discern the contract terms in this case." *Id.* at 594 n. 27. The court in *First Commerce III* recognized that the language of the Guaranty RCMA warning that the risk of regulatory change may operate to plaintiff's detriment "is identical to paragraph VII(D) of the FCC RCMA," but stated that other differences in contract language led it to conclude that "the contract language in this case" was not "necessarily ... the 'very different contract language' that the Supreme Court mentioned in

its *Guaranty* footnote." *Id.* at 594 (quoting *Winstar III*, 518 U.S. at 869 n. 15, 116 S.Ct. 2432).

The court concluded its analysis by observing that the view that the *Guaranty* footnote had any "precedential holding" has been "'consistently rejected.'" *Id.* (quoting *Hughes v. United States*, 58 Fed.Cl. 291, 305 (2003)). "Even if the differences between the contract documents in this case and those in *Guaranty* were less significant," the court found, "the authority of the *Guaranty* footnote ... would not, by itself, give enough guidance to resolve the allocation of risk of regulatory change question." *Id.* at 595. Instead, the court looked to other *Winstar* cases "in this circuit" for interpretation of conflicting contract language. *Id.*

Because "the parties ha[d] not pointed ... to any Federal Circuit decisions reconciling the [conflicting contract terms]," the court looked to *Winstar III* and subsequent cases decided by the Court of Federal Claims. *Id.* at 596. The court found that *Winstar III* was "not dispositive," although it "supports the analysis utilized by the [trial court] authorities cited [by plaintiff] and the court's resolution of this issue in favor of plaintiff." *Id.* Absent controlling authority, *First Commerce III* allocated the risk of regulatory change to defendant based on cases cited by plaintiff, which the court found to be "persuasively decided on similar facts." *Id.* at 595–96.[2]

The court cited three decisions for the proposition that the more specific contract language promising forbearance should take precedence over the more general RCMA provision warning of the risk of regulatory change. *Id.* at 595–96 (finding that the general RCMA terms "must yield to the specific promise" of forbearance) (citing *Hughes*, 58 Fed.Cl. at 305); *see also id.* at 596 (citing *Admiral Fin. Corp. v. United States*, 54 Fed. Cl. 247, 257 (2002) (*Admiral I*), and *Franklin Fed. Sav. Bank v. United States*, 53 Fed.Cl. 690, 715 (2002)). The court also cited three decisions for the proposition that harmoniza-

tion of the conflicting contract language did not shift the risk of regulatory change to plaintiff acquirers. *Id.* at 596 (citing *Admiral I*, 54 Fed.Cl. at 257; *Sterling Sav. v. United States*, 53 Fed.Cl. 599, 614 (2002); and *Castle v. United States*, 42 Fed.Cl. 859, 863–64 (1999)). *Admiral I* was the only case this court relied upon in *First Commerce III* for both its specific-over-general and harmonization approach to construing the RCMA and forbearance letter terms. *Id.*

## II. Discussion

### A. Standard of Review

#### 1. Cross–Motions for Summary Judgment

"Summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1037 (Fed.Cir.2003); *see* Rules of the United States Court of Federal Claims (RCFC) 56(c). Material facts are those facts that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All justifiable inferences from the evidence must be drawn in favor of the non-movant. *Id.* at 255, 106 S.Ct. 2505. When the court considers cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Def. Sys., Inc. v. United States*, 45 Fed.Cl. 450, 457 (1999).

#### 2. Reconsideration

 Rule 59 affords this court the discretion to grant reconsideration "to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59(a)(1); *see Yuba*

---

**2.** The court rejected defendant's reliance on *Southtrust of Georgia, Inc. v. United States*, 54 Fed.Cl. 741 (2002), *appeal voluntarily dismissed*, 68 Fed.Appx. 191 (Fed.Cir.2003), as allocating

risk to the plaintiff "[b]ecause there was no forbearance letter ... and because there were no conflicting contract terms to reconcile." *First Commerce III*, 60 Fed.Cl. at 595.

*Natural Res., Inc. v. United States,* 904 F.2d 1577, 1583 (Fed.Cir.1990) ("The decision whether to grant reconsideration lies largely within the discretion of the [trial] court."). Rule 59 does not allow the court to hear arguments which were previously made and carefully considered. *Coconut Grove Entm't, Inc. v. United States,* 46 Fed.Cl. 249, 255 (2000). Instead, the moving party must show: "(1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice." *Id.* (citing *Fru–Con Constr. Corp. v. United States,* 44 Fed.Cl. 298, 300–01 (1999)). Accordingly, the court must consider a motion for reconsideration with "exceptional care." *Carter v. United States,* 207 Ct.Cl. 316, 518 F.2d 1199, 1199 (1975).

On the grounds that "an intervening change in the controlling law has occurred," *Coconut Grove,* 46 Fed.Cl. at 255, defendant seeks reconsideration of this court's May 18, 2004 opinion granting summary judgment to plaintiff on liability for breach of contract. *See* Def.'s Mot. at 8. "Grounds exist for reconsideration of the Court's May 18, 2004, Opinion, in light of the Federal Circuit's decision in *Admiral,* a controlling decision that was issued after the Court's Opinion in this case." *Id.; see Admiral Fin. Corp. v. United States,* 378 F.3d 1336 (Fed.Cir.2004) (*Admiral III*) (decided on August 5, 2004). Furthermore, defendant asserts that its "motion is timely because the Court has not yet entered judgment in this case." Def.'s Mot. at 8 (citing RCFC 59(b) & its Rules Committee Note for the fact that "non-final orders . . . can be the subject of motions for reconsideration at any time before final judgment").

### B. Analysis

■ Defendant argues that, pursuant to the Federal Circuit's decision in *Admiral III,* this court's decision of May 18, 2004 granting plaintiff summary judgment on liability should be vacated, and summary judgment on liability should be granted for defendant. Def.'s Mot. at 1. This court reached its May 18, 2004 decision, defendant argues, by "reject[ing], as controlling authority, the Elev-

enth Circuit's decision in *[Guaranty],* and the Supreme Court's analysis [of *Guaranty* ] in *[Winstar III]*" and relying instead "in part, upon the trial court's opinion in *[Admiral I]* and related cases reaching similar conclusions." *Id.* at 2 (citations omitted). Specifically, defendant requests reconsideration of this court's decision regarding the risk-allocation language of FCC's RCMA: "Without the benefit of the appellate court's guidance [in *Admiral III* ], this Court held [in *First Commerce III* ] that FCC's RCMA did not allocate to FCC the risk of regulatory change regarding the treatment of goodwill." *Id.* at 1 (citing *First Commerce III,* 60 Fed. Cl. at 589–97).

Defendant asserts that in *Admiral III* the "Federal Circuit embraced the Eleventh Circuit's decision in *Guaranty* and the Supreme Court's analysis in *Winstar [III]*." *Id.* at 11. Therefore, defendant argues that:

> [b]ecause the contractual provision at issue in *Admiral*-specifically Clause VI(D) of the RCMA-is identical to Clause VII(D) in FCC's RCMA, and because any differences [among] FCC's, Guaranty's, [and] Admiral's RCMAs are not meaningful, particularly in light of the Federal Circuit's analysis, this Court should vacate its prior summary judgment opinion, and grant summary judgment in our favor.

*Id.* at 3.

Defendant observes that "Clause VII(D) of FCC's RCMA is identical to Clause VI(D) of Admiral's RCMA" and argues that the Federal Circuit in *Admiral III* found that this same language subjected acquirers to changing capital requirements, including "the 'methods' by which regulatory capital was calculated, *i.e.,* the exclusion of goodwill." Def.'s Mot. at 11 (quoting *Admiral III,* 378 F.3d at 1341). Defendant also argues that the government's promise of regulatory forbearance was not illusory because FCC received the benefits of "using a 25–year forbearance before FIRREA" and because "FCC received additional consideration or 'promises' from the Government in the form of additional forbearances." *Id.* (citing *First Commerce III,* 60 Fed.Cl. at 585). Because "the Federal Circuit rejected this Court's rationale by reversing the trial court's deci-

sion in *Admiral [III]*," and because "[t]here is no question that *Admiral [III]* is controlling authority in this Court," defendant argues that *First Commerce III* is in conflict with the appellate court's decision in *Admiral III. Id.* at 12.

Plaintiff insists that "*Admiral III* is not dispositive based on the facts in FCC's case." Pl.'s Opp'n at 1. Arguing that "defendant has exaggerated the breadth of the Federal Circuit's holding in *Admiral III*," plaintiff claims that, because "there are significant differences in FCC's documentation from that construed in *Guaranty* (and now in *Admiral [III]*)" and because "other parts of this Court's reasoning [in *First Commerce III*] were not addressed in *Admiral III*," First Commerce's case "[was] not and should not be impacted by [*Admiral III's*] result." Pl.'s Opp'n at 1–2 (footnote omitted). Specifically, plaintiff contends that this court's "specific language taking precedence over general language" analysis was not addressed by the trial or appellate courts in *Admiral, id.* at 18 (internal quotations omitted), and that this line of reasoning still holds in plaintiff's case. *Id.* at 20–21 ("[W]hen the RCMA clause warns only of a change in the capital requirement regulation-as in FCC's case-then the clause is necessarily more general and must give way to FCC's specific promise of 25–year amortization for its goodwill that will count as regulatory capital.") (emphasis omitted). Plaintiff argues that, because FCC's RCMA did not reference regulations prescribing methods of capital accounting, and because the risk-shifting language referred only to the general types of regulatory capital allowed plaintiff, the FCC documentation did not allocate to FCC the risk of regulatory change regarding accounting methods, a subject more specifically described in FCC's forbearance letter. *Id.* at 12.

Defendant replies that a "running theme throughout [plaintiff's argument] is that even if no meaningful differences exist between its RCMA and Admiral's, *any* difference permits this Court, for lack of 'identicalness,' to ignore the rationale and holding in *Admiral [III]* and decide this case for itself upon a clean slate." Def.'s Reply at 15. Defendant points out that "the Federal Circuit in its

opinion relied exclusively upon Clause VI(D) of Admiral's RCMA." *Id.* at 16 ("The Federal Circuit had that language of both Admiral's and Guaranty's RCMAs before it. If it believed the definitional language in these agreements ... was necessary to support its ruling, it certainly is likely to have said so."). Defendant also argues that plaintiff's reasoning erroneously assumes that "a conflict, in fact, exists between the forbearance and RCMA language." *Id.* at 18 (emphasis omitted).

> Relying upon *Guaranty*, the Federal Circuit [in *Admiral III*] held that there was no conflict; it rejected the argument that ... the forbearance promise [was rendered] "illusory," and interpreted the contract to mean that Admiral " 'had the right to treat its goodwill as regulatory capital and amortize it over a twenty-five year period for so long as the statutes and regulations governing the area remained as they were when the agreement was signed.' "

*Id.* (quoting *Admiral III,* 378 F.3d at 1341 (quoting *Guaranty,* 928 F.2d at 1001)). Finally, defendant notes that "this Court has already rejected FCC's argument in light of [the] Federal Circuit's ruling" in *Coast–to–Coast Financial Corp. v. United States,* 62 Fed.Cl. 469 (2004), which applied *Admiral III* to its analysis of the risk of regulatory change in a *Winstar*-related case. *Id.* at 19.

In *Admiral III,* the Federal Circuit held that the "risk-shifting" language in the RCMA of the Admiral contracts-which was the same language used in the Guaranty contracts-shifted the risk of regulatory change to plaintiff. 378 F.3d 1336, 1343 (2004). In finding for defendant, *Admiral III* affirmed the trial court on different grounds. *Id.* at 1345. The trial court first found the government liable for breach of contract, *Admiral I,* 54 Fed.Cl. 247 (2002), but then found that plaintiff had repudiated the contract through anticipatory breach, *Admiral II,* 57 Fed.Cl. 418 (2003). The Federal Circuit considered defendant's argument, which failed at trial, but which defendant advanced "as an alternative ground for affirmance." *Admiral III,* 378 F.3d at 1339. The court accepted defendant's alternative

ground, finding that plaintiff assumed the risk of regulatory change and thus was not harmed by the enactment of FIRREA; it therefore did not reach the issue of anticipatory breach on which the trial court based its opinion. *Id.* at 1343, 1345.

In deciding *Admiral III,* the Federal Circuit read *Winstar III* to "stand[ ] for the proposition that the government is still obligated to honor its contracts even if the governing regulations change." *Id.* at 1342–43. *Winstar III* "recognized that the government could address the risk-shifting issue in bargaining and could even 'reserve the right to change the capital requirements without any responsibility to the acquiring thrift.'" *Id.* at 1343 (quoting *Winstar III,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432). That is, both *Winstar III* and *Admiral III* contemplate that the government may shift the risk of regulatory change onto the acquiring institutions without rendering illusory its promise of forbearance. As *Admiral III* demonstrates, the risk-shifting language is key:

> [T]he example used by the plurality opinion [in *Winstar III* ] for language that would have the effect of shifting the risk of a regulatory change to the private contract was the contract language used in both *Guaranty* and in the contract with Admiral. Thus, following the lead of the Eleventh Circuit in *Guaranty* and the Supreme Court plurality in *Winstar [III],* we hold that Admiral assumed the risk of a regulatory change ... [and therefore] cannot recover damages based on ... regulations ... that altered Admiral's obligations under the contract.

*Id.* at 1343.

The Federal Circuit in *Admiral III* elected to follow the Eleventh Circuit's decision in *Guaranty,* which held that an "identical clause" to the one at issue in FCC's RCMA shifted the risk of regulatory change onto the acquirer. *Id.* at 1339. Although the Federal Circuit acknowledged that *Guaranty* was not binding upon it, the court noted that "we accord great weight to the decisions of our sister circuits when the same or similar issues come before us, and we 'do not create conflicts among the circuits without strong cause.'" *Id.* at 1340 (quoting *Wash. Energy*

*Co. v. United States,* 94 F.3d 1557, 1561 (Fed.Cir.1996)). Thus the Federal Circuit construed *Winstar III* and *Guaranty* to allow the government to shift the risk of regulatory change onto plaintiffs in *Winstar*-related cases without rendering illusory its promises of forbearance regarding the accounting for "supervisory goodwill." *Id.* at 1343 ("Thus, following the lead of the Eleventh Circuit in *Guaranty* and the Supreme Court plurality in *Winstar,* we hold that Admiral assumed the risk of a regulatory change.").

Because the RCMA language "[o]n its face, ... contemplated that the government might alter the regulations governing the supervision of thrifts ...[and because Admiral] agree[d] to the [risk-shifting] clause, Admiral acknowledged that its obligations might change if the regulatory regime changed." *Id.* at 1339. The trial court in *Admiral I* had harmonized the conflicting terms of the contract to avoid viewing the promise of forbearance as illusory. 54 Fed.Cl. at 257. Such harmonization led the trial court to read the RCMA and the forbearance letter as requiring the acquirer to "abide by changes in 'capital requirements' ... or perhaps some other aspect of regulatory compliance," but not to "expos[e] Admiral to the risk of sweeping changes in the bargained for method of accounting." *Id.* The Federal Circuit "disagree[d]" with the trial court's reasoning in *Admiral III:*

> Clause VI(D) does not contain any qualifications of the sort to which the trial court referred. The clause states that the government might make changes to the regulations that could increase Admiral's obligation under the contract. It does not limit those changes to increasing or decreasing the level of capital that thrifts must maintain, as opposed to changing the accounting methods the Bank Board requires.... [T]he government's reservation of the right to change the extent of its performance as to some of its promises does not render the contract illusory as long as the government has otherwise given consideration, as is plainly the case here.

*Id.* at 1341 (citing Restatement (Second) of Contracts § 80(2) (1979)).

Because the risk-shifting language of the RCMA, "[o]n its face," formed the basis for the decision in *Admiral III,* the decision analyzed cases with risk-shifting language similar to that used in the Admiral contract. *Admiral III,* 378 F.3d at 1339. The two most relevant cases the court discussed were *Sterling Savings v. United States,* 53 Fed.Cl. 599 (2002), and *Castle v. United States,* 301 F.3d 1328 (Fed.Cir.2002), *aff'g in part and rev'g in part on other grounds Castle v. United States,* 42 Fed.Cl. 859 (1999).[3] The Federal Circuit disapproved of the application of *Guaranty* in *Sterling* because it disagreed with *Sterling's* interpretation of the risk-shifting language at issue. *Id.* at 1341. And the court distinguished *Castle* as inapplicable to the "risk shifting issue" and thus without "precedential force." *Id.* at 1340.

*Sterling* held that language similar to that in the FCC RCMA did not allocate the risk of regulatory change to plaintiff and that defendant was not insulated from contract liability. 53 Fed.Cl. at 614. *Sterling* relied on *Castle* to find that "the *Guaranty* decision did not hold that the words of the successor regulation provision in [and] of themselves mandate that the risk of regulatory change must be shifted onto the plaintiffs." *Id.* (citing 42 Fed.Cl. at 862–64). Rather, *Sterling* read *Guaranty* to harmonize conflicting terms to avoid rendering the government's promise of forbearance illusory. *Id.* The court in *Sterling* preferred "[p]laintiff's reading of the successor regulation clauses" as "more harmonious with the overall purpose of the Agreement" and thus held that the risk of regulatory change was not shifted to plaintiffs. *Id.*

The Federal Circuit criticized *Sterling* for its reading of *Guaranty:*

> The *Sterling* court read *Guaranty* as not holding that the purported risk-shifting clause mandated that the risk of regulatory change was shifted to the plaintiffs. Instead, the court ... ruled that the risk-shifting clause meant that the acquirer could be required to comply with regulations regarding maintenance of capital levels, payment of dividends, and reporting of deviations from the business plan, but that the clause did not alter the government's obligation to allow the plaintiff to treat supervisory goodwill as an asset and amortize it over the period set forth in the contract.

*Admiral III,* 378 F.3d. at 1341 (citation omitted). *Admiral III* disapproved of such a harmonization of contract terms: "We do not believe *Guaranty* can be distinguished in that manner. The court in *Guaranty* found that the *language in question* altered the government's obligations with respect to the regulatory capital and amortization issues and shifted to Guaranty the risk of FIRREA's regulatory change with respect to those issues." *Id.* (emphasis added).

The Federal Circuit also distinguished its decision in *Castle v. U.S.,* 301 F.3d 1328 (Fed.Cir.2002), as "not compel[ling] a result different from that reached in *Guaranty* with respect to the risk-shifting issue." *Id.* at 1340. The plaintiffs in *Admiral III* argued that *Castle* should preclude *Guaranty* from having any "precedential force" in the Federal Circuit. *Id.* But the court found that *Castle* was a takings case that "did not address whether the contract shifted the risk of regulatory change onto the acquirer. *Castle* did no more than state that, since FIRREA

---

3. The *Admiral III* court distinguished *Southern California Federal Savings & Loan Ass'n v. United States,* 52 Fed.Cl. 531 (2002), as having "significantly different" risk-shifting language from that of the Admiral contract, language which merely "stated the obvious-that the acquirer was bound by the law-without providing for any shift of risk in the event of a change in the law." 378 F.3d at 1341–42. *Southern California,* like other *Winstar*-related decisions, harmonized the conflicting terms so as not to render the government's forbearance promise illusory, which would allow the government to avoid contract liability altogether. 52 Fed.Cl. at 547. *Admiral III* also addressed *California Federal Bank v. United States,* 39 Fed.Cl. 753, 778 (1997), a case with contract language "similar" to, but much less explicit than, the language at issue in the Admiral documents. *See* 378 F.3d at 1342 ("The language [at issue in *Admiral III* ] is far more explicit [than the language at issue in *Cal. Fed.*] with respect to the issue of regulatory change and makes clear that Admiral's obligations may increase or decrease under successor regulations.").

did not result in a taking of the acquirer's contract, the acquirer could still pursue relief pursuant to that contract." *Id.* The contract in *Castle* created no "reasonable expectation that the government would cease regulating the thrift industry," and the court's reference in *Castle* to risk-shifting language similar to that at issue in *Admiral III* had been made "[t]o support the conclusion that regulatory changes were common in the banking industry." *Id.* at 1342. Because the Federal Circuit read *Castle* to " 'expressly decline[ ]' to reach the issue of the government's liability under the contract," *id.* at 1340 (quoting *Castle,* 301 F.3d at 1339), it rejected plaintiff's argument that *Castle* supported its view that the risk of regulatory change was not allocated to plaintiff. *Id.* at 1340.

The "language in question" on which the *Admiral III* court focused is identical to the language that appears in clause VII(D) of the third paragraph of the FCC RCMA. *Compare Admiral III,* 378 F.3d at 1339 (" 'All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.' ") (quoting clause VI(D) of the Admiral RCMA) *with First Commerce III,* 60 Fed.Cl. at 590 (" 'All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.' " (quoting clause VII(D) of the First Commerce RCMA)).

The court reads *Admiral III* to require it to adopt the "*Guaranty* footnote defense" for the explicit language of clause VII(D) in FCC's RCMA, thereby allocating the risk of regulatory change to plaintiff.[4] Plaintiff's reliance on this court's view in *First Commerce III* that the specific contract language takes precedence over general language is inapposite. There was a specific undertaking by the government with respect to forbearance, *see First Commerce III,* 60 Fed.Cl. at 574, but the Federal Circuit's holding that the government's promise of forbearance can not be illusory where the plaintiff has the benefit of it for some period of time also applies to this case. *Compare Admiral III,* 378 F.3d at 1341 ("[T]he government's reservation of the right to change the extent of its performance as to some of its promises does not render the contract illusory as long as the government has otherwise given consideration, as is

4. The court notes that *Coast–to–Coast Financial Corp. v. United States,* in a procedural posture similar to this case, applies the Federal Circuit's *Admiral III* analysis in the same manner. 62 Fed.Cl. 469, 472 (2004). In a liability decision that predated *Admiral III,* the *Coast–to–Coast* court initially held that FIRREA constituted a breach by the government of its promise of regulatory forbearance:

> One of the liability defenses [at trial] was that [plaintiff] assumed the risk of regulatory change embodied in FIRREA. We rejected that defense. In doing so, we cited the decision of this court in *Admiral Financial Corp. v. United States,* 54 Fed.Cl. 247 (2002), because the relevant contractual language in this case and that of *Admiral [I]* was identical. We were persuaded by the reasoning of *Admiral [I],* as well as related decisions. *Admiral [I]* was appealed and subsequently reversed on this very point. *Admiral II[I],* 378 F.3d at 1340–43 .... [Now] the government asks that we vacate [our liability] decision ... insofar as liability is predicated on a FIRREA-based breach.

*Id.* at 472. The court read *Admiral III* as controlling authority on the risk-shifting language at issue which made it "impossible" for the court to maintain its prior liability decision. *Id.* at 473. *Coast–to–Coast* rejected plaintiff's argument that *Admiral III* was distinguishable because of the presence of contract language other than the risk-shifting clause. *See id.* ("Plaintiff contends that this language, apparently not present in the *Admiral* facts, distinguishes the two cases on the theory that [a] reference to the forbearances provided elsewhere constitutes an independent assurance that the forbearances trump any changes in regulations."). The court read the Federal Circuit's opinion to make the "language of the risk-shifting clause to be controlling due to its specificity" and noted that the risk-shifting language used in plaintiff's contract documents was "identical" to the language in Admiral's RCMA. *Id.* Accordingly, the court in *Coast–to–Coast* vacated its liability decision and awarded summary judgment to defendant on the FIRREA breach claim. *See id.* (granting summary judgment for the United States on plaintiff's FIRREA breach claim and amending the court's damages decision "to reflect that plaintiff's damages claim is predicated exclusively on a [breach] theory [other than FIRREA]").

plainly the case here.") (citing Restatement (Second) of Contracts § 80(2) (1979)) *with First Commerce III*, 60 Fed.Cl. at 585 (relying on section 80 of the Restatement (Second) of Contracts to determine that "FCC did bargain for and give consideration for the forbearance related to the 25–year amortization of goodwill, because it was one promise of a set of promises made by the government").

III. Conclusion

For the foregoing reasons, the court finds that the Federal Circuit's acceptance of the "*Guaranty* footnote defense" in *Admiral III* alters the controlling law on which this court's May 18, 2004 decision was based. *First Commerce III*, 60 Fed.Cl. at 596. Accordingly, the court GRANTS defendant's motion for reconsideration, VACATES its finding of summary judgment on liability for plaintiff, and GRANTS defendant's motion for summary judgment on liability. The Clerk of the Court shall dismiss plaintiff's complaint. No costs.

IT IS SO ORDERED.